Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/11/2025 09:09 AM CDT

Rodney Johnson, appellant, v. City of Omaha
and FCC Environmental Services
Nebraska, LLC, appellees.

___ N.W.3d ___

Filed July 11, 2025.    No. S-23-923.

1. **Standing: Jurisdiction: Parties.** Standing is a jurisdictional component of a party's case, because only a party who has standing may invoke the jurisdiction of a court; determination of a jurisdictional issue which does not involve a factual dispute presents a question of law.

2. **Rules of the Supreme Court: Pleadings: Appeal and Error.** An appellate court reviews a district court's denial of a motion to amend under Neb. Ct. R. Pldg. § 6-1115(a) (rev. 2025) for an abuse of discretion.

3. **Summary Judgment: Appeal and Error.** An appellate court reviews rulings on a motion for summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.

4. **Statutes: Appeal and Error.** Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.

5. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.

6. **Standing: Jurisdiction: Parties.** Standing is a jurisdictional component of a party's case because only a party who has standing may invoke the jurisdiction of a court.

7. **Standing: Jurisdiction: Pleadings: Evidence: Proof: Words and Phrases.** If a motion challenging standing is made at the pleadings stage, it is considered a "facial challenge" and a court will review the pleadings to determine whether there are sufficient allegations to establish the plaintiff's standing. If a motion challenging standing, and thus the court's subject matter jurisdiction, is raised after the pleadings stage and the court holds an evidentiary hearing and reviews evidence outside the pleadings, it is considered a "factual challenge" and the

party opposing the challenge must offer evidence to support its burden of establishing subject matter jurisdiction.

8. **Jurisdiction: Pleadings: Appeal and Error.** When an appellate court reviews a trial court's decision based on a factual challenge to standing, it reviews any factual findings under the clearly erroneous standard but reviews the ultimate standing determination de novo, because it presents a question of law.

9. **Standing: Claims.** The general common-law standing inquiry focuses on whether the party bringing the suit has suffered or will suffer an injury in fact.

10. **Standing: Municipal Corporations.** To have standing to bring an action to restrain an act of a municipal body, litigants must usually show some injury peculiar to themselves.

11. **Equity: Taxation: Injunction.** Because taxpayers have an equitable interest in public funds, a resident taxpayer may bring an action to enjoin the illegal expenditure of public funds raised for governmental purposes.

12. **Standing: Taxation: Proof: Municipal Corporations.** The mere allegation of illegal expenditure by public officials is not sufficient in itself to confer standing on a resident taxpayer. Instead, to assert standing, a resident taxpayer must also allege that a demand was made upon the municipal or public corporation and that the demand was refused, or facts which show that such a demand would be useless.

13. **Pleadings.** Once a responsive pleading has been filed in a civil action, a party may no longer amend its pleading as a matter of course.

14. ____. The denial of a motion seeking leave to amend pleadings is appropriate only in those limited circumstances in which undue delay, bad faith on the part of the moving party, futility of the amendment, or unfair prejudice to the nonmoving party can be demonstrated.

15. **Pleadings: Appeal and Error.** Permission to amend pleadings is addressed to the sound discretion of the trial court; absent an abuse of that discretion, the trial court's decision will be affirmed.

16. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

17. **Pleadings: Summary Judgment: Evidence.** It is not an abuse of discretion to deny leave to amend when a party seeks to add a new claim or defense after a motion for summary judgment has been heard and submitted, unless evidence or testimony exists in the record indicating that the proposed claim or defense was newly discovered or that counsel was previously unaware of the claim.

18. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

19. **Summary Judgment.** Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

20. **Summary Judgment: Proof.** The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial. If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.

21. **Summary Judgment.** In the summary judgment context, a fact is material only if it would affect the outcome of the case.

22. **Statutes.** The object of competitive bidding statutes is to invite competition and prevent favoritism and fraud.

23. **Contracts: Statutes: Words and Phrases.** Competitive bidding statutes are enacted for the benefit of taxpayers and exist to invite competition; to guard against favoritism, improvidence, extravagance, fraud, and corruption; and to secure the best work or supplies at the lowest possible price.

24. **Municipal Corporations: Contracts: Courts.** Public bodies exercise discretion when awarding bids under the competitive bidding process, and courts will show deference when reviewing challenges to a public body's award decisions.

25. **Municipal Corporations: Fraud: Courts.** Where there is no showing that the administrative body acts arbitrarily, or from favoritism, ill will, fraud, collusion, or other such motives, it is not the province of a court to interfere and substitute its judgment for that of the administrative body.

26. **Municipal Corporations: Courts: Appeal and Error.** When a public body has discretion to make a decision during the competitive bidding process, a court is essentially limited to reviewing that decision for bad faith.

27. **Municipal Corporations: Contracts.** Public bodies have discretion to seek clarification of bids, even after bids have been opened, so long as the bid is not substantively or materially altered.

28. **Contracts.** Bids cannot be substantively changed after opening because otherwise the purpose of competitive bidding, which is to invite competition and prevent favoritism and fraud, would be completely thwarted.

29. ____. Although the substance of a bid cannot be changed after the time for opening, mere irregularities in the form of a bid may still be corrected or disregarded after bids are opened.

30. **Contracts: Words and Phrases.** The test for whether there has been a "material variance" in a bid is whether it gives a bidder a substantial advantage or benefit not enjoyed by the other bidders.

31. **Statutes.** Statutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning.

32. ____. It is not within the province of a court to read a meaning into a statute that is not warranted by the language; neither is it within the province of a court to read anything plain, direct, or unambiguous out of a statute.

33. **Statutes: Legislature: Intent.** In construing a statute, the legislative intention is to be determined from a general consideration of the whole act with reference to the subject matter to which it applies and the particular topic under which the language in question is found, and the intent as deduced from the whole will prevail over that of a particular part considered separately.

34. **Statutes.** Statutes pertaining to the same subject matter should be construed together; such statutes, being in pari materia, must be construed as if they were one law, and effect must be given to every provision.

35. ____. To give effect to all parts of a statute, a court will attempt to reconcile different provisions so they are consistent, harmonious, and sensible and will avoid rejecting as superfluous or meaningless any word, clause, or sentence.

36. **Municipal Corporations: Fees.** The voter approval requirement in Neb. Rev. Stat. § 13-2020(4) (Reissue 2022) applies only when a city of the metropolitan class establishes rates or charges to be paid to the city by each person whose premises are served.

Appeal from the District Court for Douglas County: JAMES M. MASTELLER, Judge. Affirmed.

Adam J. Sipple, of Sipple Law, for appellant.

Ryan J. Wiesen, Deputy Omaha City Attorney, for appellee City of Omaha.

James G. Powers and Alexander K. Shaner, of McGrath, North, Mullin & Kratz, P.C., L.L.O., for appellee FCC Environmental Services Nebraska, LLC.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, and Freudenberg, JJ.

Stacy, J.

In 2018, the City of Omaha (City) solicited competitive bids for a contract to collect and dispose of residential solid waste for the years 2021 through 2030. After the contract was awarded, a resident taxpayer sued the City and others, alleging that the contract was an illegal expenditure of public funds and violated the Integrated Solid Waste Management Act (ISWMA).[1] The district court granted summary judgment in favor of the defendants and dismissed the action. The taxpayer appeals. Finding no merit to any of the assigned errors, we affirm.

## I. BACKGROUND

### 1. Integrated Solid Waste Management Act

The ISWMA was enacted in 1992, and it mandates that "each county and municipality shall provide or contract for facilities and systems as necessary for the safe and sanitary disposal of solid waste generated within its solid waste jurisdiction area."[2] The ISWMA allows flexibility in how a county or municipality may meet its obligation to provide facilities and systems for solid waste disposal. The primary provisions in this regard are set out in § 13-2020(2) and (3) and state:

> (2) A county, municipality, or agency may jointly own, operate, or own and operate with any person any facility or system and may enter into cooperative agreements as necessary and appropriate for the ownership,

---

[1] Neb. Rev. Stat. §§ 13-2001 to 13-2043 (Reissue 2022).

[2] § 13-2020(1).

operation, or ownership and operation of any facility or system.

(3) A county, municipality, or agency may, either alone or in combination with any other county, municipality, or agency, contract with any person to provide any service, facility, or system required by the [ISWMA].

The ISWMA also allows flexibility in how those receiving solid waste disposal services may be charged. The primary provisions in this regard are found in § 13-2020(4) and (5). Section 13-2020(4) addresses charges established by and paid to the governing body of a county, municipality or agency, and it states, in relevant part:

(4) The governing body of a county, municipality, or agency may make all necessary rules and regulations governing the use, operation, and control of a facility or system [for disposal of solid waste]. Such governing body may establish just and equitable rates or charges to be paid to it for the use of such facility or system by each person whose premises are served by the facility or system, including charges for late payments, *except that no city of the metropolitan class shall impose any rate or charge upon individual residences unless a majority of those voting in a regular or special election vote affirmatively to approve or authorize establishment of such a rate or charge.* . . . If the service charge so established is not paid when due, such sum may be recovered by the county, municipality, or agency in a civil action or, following notice by regular United States mail to the last-known address of the property owner of record and an opportunity for a hearing, may be certified by the governing body of the county, municipality, or agency to the county treasurer and assessed against the premises served and collected or returned in the same manner as other taxes are certified, assessed, collected, and returned.

(Emphasis supplied.) Section 13-2020(5) addresses charges when a governing body contracts to provide waste disposal facilities or systems, and it provides:

(5) If the county, municipality, or agency enters into a contract with a person to provide a facility or system, such contract may authorize the person to charge the owners of premises served such a service rate therefor as the governing body determines to be just and reasonable or the county, municipality, or agency may pay therefor out of its general fund or the proceeds of any tax levy applicable to the purposes of such contract or assess the owners of the premises served a reasonable charge therefor to be collected as provided in this section and paid into a fund to be used to defray such contract charges.

One of the central issues in this appeal is whether certain charges are subject to the voter approval requirement in § 13-2020(4) for cities of the metropolitan class. Currently, Omaha is the only city in Nebraska that meets the population threshold for cities of the metropolitan class.[3]

## 2. Bid Package and Contract

The parties generally agree that both before and after the ISWMA was enacted, the City provided curbside collection of residential solid waste through a service funded by municipal tax dollars. At oral argument before this court, the parties agreed that, historically, the City has used its general funds to provide this service and that Omaha residents have not paid a fee to the City for the curbside collection of residential solid waste.[4]

In October 2018, the City published bid specifications[5] for a new contract for the "curbside collection of residential Solid Waste, which includes Garbage, Recyclables and Yardwaste

[3] See Neb. Rev. Stat. § 14-101 (Reissue 2022) (city of metropolitan class has "population of four hundred thousand inhabitants or more").

[4] See, also, Floor Debate, L.B. 1257, 92d Leg., 2d Sess. 11160-70 (Mar. 23, 1992).

[5] See, generally, Omaha City Charter, art. V, § 5:16 (2024) (requiring contract over $50,000 to be subject to competitive bidding process and awarded to lowest and best bidder).

and delivery of collected Solid Waste to the City specified disposal facility." The contract was for the years 2021 through 2030, and the published bid specifications included four separate packages:

• "Bid Package A" was for "Solid Waste Collection";
• "Bid Package B" was for "Collection Carts Procurement and Distribution";
• "Bid Package C" was for "Spring and Fall Cleanup"; and
• "Bid Package D" was for "Extraordinary Contractor Services."

Pursuant to the bid specifications, a contractor could be awarded Bid Packages B through D only if it was also awarded Bid Package A. Because only Bid Packages A and D are directly relevant to this appeal, we address those in more detail.

Bid Package A was generally described as the "Base Level of Service," and two alternatives were included in the bid specifications. Under the first alternative, the contractor would be paid by the City to provide weekly collection of three 96-gallon carts: one for garbage, one for yard waste,[6] and one for recyclables. Under the second alternative, the contractor would be paid by the City to provide weekly collection of two 96-gallon carts: one cart for commingled garbage and yard waste and the other cart for recycling.

Bid Package D was generally described as "Extraordinary Contractor Services," and it required the contractor to "administer and operate" a program under which residents could purchase "additional curbside collection and hauling services for Solid Wastes beyond the Base Level of Service selected from Bid Package A." Under Bid Package D, contractors would be paid for extraordinary services by the "[r]esidents who have selected and agreed to purchase these services, at the Unit Prices indicated on the Agreement." More specifically, in exchange for payments directly from the residents, the contractor would either (1) provide the resident with one

---

[6] See § 13-2016.01 (defining yard waste as "grass and leaves"). See, also, § 13-2039 (generally categorizing yard waste as type of solid waste).

additional 96-gallon cart for weekly curbside collection of commingled solid waste or (2) provide curbside collection of bundles of additional yard waste affixed with stickers purchased by the residents. For purposes of Bid Package D, additional yard waste was described as the "volume[] . . . in excess of the Base Level of Service provided by Bid Package A." The bidding documents required each bidder to specify a unit price for each yard waste sticker and to propose an operational plan for administering the yard waste sticker program; the program was to "be fully funded by [s]ticker sales purchased by residents."

The City received bids from four entities. Those bids were publicly opened on January 30, 2019, and were thereafter transmitted to Omaha's public works department for evaluation. During the evaluation process, it was discovered that when bidding on the yard waste sticker program, three of the four bidders each based their sticker price on a 30-gallon unit, and one bidder based its sticker price on a unit of 3 cubic yards.

More specifically, three bidders proposed selling stickers to residents that could be affixed to bundles of yard waste up to 30 gallons, and each bidder submitted a bid price between $1.50 and $2 per sticker. One bidder, Fomento de Construcciones y Contratas, S.A. (FCC-Spain), based its bid for yard waste stickers on a unit price of 3 cubic yards, or 606 gallons per unit. FCC-Spain proposed selling stickers to residents that could be affixed to bundles of yard waste up to 606 gallons, and it submitted a bid price of $40 per sticker. It also proposed that residents would call to schedule collection of this volume of yard waste.

It is undisputed that for purposes of the yard waste sticker program in Bid Package D, the City intended the bid specifications to include a standard 30-gallon unit for the sticker price, but it mistakenly failed to do so. It is also undisputed that after the bids were opened, the City recognized its error and sent a letter to FCC-Spain "requesting a clarification" of its bid for the yard waste sticker program.

The City's letter to FCC-Spain acknowledged that in connection with Bid Package D, it had failed to "indicate a limit to the bag size a resident could set out." The letter stated that the city "envisioned that residents would use the commercially available paper bags which hold a volume of 30 gallons each" and stated that the City planned to "codify a limit of 30 gallons per yard waste bag that residents could use." The letter expressly asked FCC-Spain to clarify its bid price for the yard waste sticker using a standard 30-gallon yard waste bag and to clarify how residents would schedule collection of such bags. In doing so, the letter suggested that if FCC-Spain's original bid of $40 per sticker for 606 gallons was converted to a 30-gallon unit, the sticker price would be $1.98.

FCC-Spain responded to the bid clarification request in writing, stating that its bid price for yard waste stickers would be "$1.98 per sticker for each 30 gallon bag." The parties appear to agree that, mathematically, the clarified sticker price of $1.98 per 30-gallon unit represents the same price per gallon as the original sticker price of $40 per 606-gallon unit. FCC-Spain also clarified that residents would not need to schedule collection of 30-gallon yard waste bags and, instead, could place such bags out for curbside collection on the "normally scheduled yard waste service day."

Ultimately, the City decided to go with the two-cart option for Bid Package A, and it determined that FCC-Spain's bid for the entire contract was the lowest and best bid. In August 2019, the Omaha City Council passed "Ordinance No. 41925" (the ordinance), awarding the contract of approximately $227 million to FCC-Spain.[7] At the time, the Omaha City Council knew that FCC-Spain intended to form a subsidiary Nebraska corporation headquartered in Omaha to perform the contract. The record establishes that FCC-Spain ultimately formed

---

[7] See Omaha Mun. Code, ch. 10, art. IV, § 10-107 (2024) (providing award of contract for $50,000 or more shall be awarded to lowest and best bid by resolution of city council).

FCC Environmental Services Nebraska, LLC (FCC-Nebraska), for that purpose.

Two days after the ordinance was enacted, Rodney Johnson hand-delivered a taxpayer letter to the Omaha City Council demanding recission of the ordinance and the contract. The city attorney denied that demand in September 2019. One month later, the City and FCC-Nebraska executed a written contract for the curbside collection of residential solid waste.

### 3. Complaint and Answers

In December 2020, Johnson filed this lawsuit in the district court for Douglas County, challenging the ordinance and seeking to void the contract. Johnson filed an amended complaint that named additional defendants, but after successful motions to dismiss that are not challenged on appeal, only two defendants remained: the City and FCC-Nebraska.

Johnson's operative amended complaint, filed in June 2021, referred to FCC-Nebraska as "the successful bidder" and made no mention of FCC-Spain, impliedly treating the two entities as interchangeable. Relatedly, the record shows that during most of the time this case was pending before the trial court, the parties and the court referred collectively to both entities as "FCC." We will do the same except when necessary to address a proposed claim specifically directed at one FCC entity but not the other.

Johnson's operative complaint sought a declaration that the ordinance, and the related contract between the City and FCC, amounted to an "illegal and unauthorized expenditure of public funds," and he sought to void the contract on that basis. Johnson alleged that as a municipal taxpayer, he had standing to bring the action.

The operative complaint was styled as six separate counts. Some counts were expressly abandoned by Johnson prior to the summary judgment ruling, and only two of the remaining counts are relevant to the issues raised on appeal. One count challenged the City's request for a postopening bid

clarification, and the other challenged the legality of the rate charged by FCC for yard waste stickers.

In the count challenging the bid clarification request, Johnson alleged that it was improper for the City to request a "bid [u]nit clarification" of the yard waste sticker from just one of the four bidders and that by doing so, the City allowed FCC to materially alter its bid after the bids were opened.

In the count challenging the yard waste sticker fee, Johnson alleged that the sticker rate of $1.98 per yard waste bag was legally invalid because it had not "been put to a vote of the people on a general or special election" pursuant to § 13-2020(4). Johnson's operative amended complaint sought a declaration that the yard waste sticker fee was

> an illegal and unauthorized tax that the Court should declare as invalid, not permissible without a vote of the people, order that it cannot be now collected or required, and order the return of all monies paid to those who paid such tax believing that they were required to do so.

The City and FCC filed separate answers denying any impropriety in either the bidding process, the postopening bid clarification request, or the contract between the City and FCC. The City and FCC also raised several affirmative defenses, including that Johnson lacked taxpayer standing, that the operative amended complaint failed to state a claim upon which relief can be granted, and that the yard waste sticker program did not require voter approval under § 13-2020(4).

### 4. Pretrial Motions

After conducting discovery, all parties moved for summary judgment, and a consolidated hearing on the motions and cross-motion was set for October 2023. Shortly before the scheduled hearing, Johnson filed a motion seeking leave to amend his operative complaint to add a new claim. In this appeal, Johnson assigns error to the district court's ruling on his motion to amend and its ruling on the cross-motions for summary judgment. We summarize each in turn.

#### (a) Motion to Amend Operative Complaint

In September 2023, a few days before the scheduled summary judgment hearing and a few weeks before the scheduled trial date, Johnson filed a motion seeking leave to file a second amended complaint. His proposed second amended complaint sought to add a "count" alleging a new theory that the contract between the City and FCC-Nebraska was invalid because the successful bidder was FCC-Spain and that therefore, the City lacked authority to enter into an agreement with any other entity.

Both the City and FCC objected to Johnson's motion to amend, arguing that the request was unduly delayed and that allowing amendment would unfairly prejudice the City and FCC, because they were just days away from having their summary judgment motions heard and submitted based on claims as framed by the operative amended complaint. The district court overruled Johnson's motion to amend, and the parties' motions and cross-motion for summary judgment proceeded on the operative pleadings.

#### (b) Summary Judgment Motions

In July 2023, the City and FCC each filed motions for summary judgment on all counts of the operative amended complaint. In August 2023, Johnson filed a cross-motion motion for partial summary judgment seeking (1) a determination that he had established taxpayer standing and (2) a declaration that the contract between the City and FCC was void ab initio because the rates charged by FCC for yard waste stickers had not been approved by the voters.

At the hearing on the competing motions, all parties offered evidence in support of, and in opposition to, summary judgment. In an order entered October 27, 2023, the district court granted summary judgment in favor of the City and FCC on all claims, and it overruled Johnson's motion as moot. As relevant to the issues raised in this appeal, we summarize the court's reasoning.

### (i) Standing

All parties moved for summary judgment regarding Johnson's standing to bring the action. The City and FCC argued that Johnson had not established taxpayer standing. Johnson, on the other hand, argued that his affidavit sufficiently proved both taxpayer standing and injury-in-fact standing.

Johnson's affidavit averred that at all relevant times, he resided within the City; owned real and personal property located within the City; purchased goods and services in the City; and paid taxes to the City, including property taxes, sales taxes, and fuel taxes. Johnson also averred that his Omaha residence "generates more solid waste . . . than can fit in the two 96-gallon carts the system allows for" and that he has had to "purchase stickers to affix to paper bags for disposal of [additional] yard waste."

The district court's summary judgment order did not expressly address the standing arguments of any party. However, because the order proceeded to address the merits and dispose of the case on summary judgment, we understand the court to have impliedly determined that Johnson's affidavit established his standing to bring the action in the first instance.[8] No party challenges the district court's implicit standing determination, but we nevertheless address Johnson's standing as a threshold matter later in this opinion.

### (ii) Challenge to Bid Process

When considering Johnson's claim challenging the bid process, the court relied on a set of facts that had been agreed to

---

[8] See *Hauxwell v. Henning*, 291 Neb. 1, 4-5, 863 N.W.2d 798, 801 (2015) (observing that "given the district court's ultimate disposition of the case, it can be implied the district court determined that [plaintiff] had standing"), *disapproved on other grounds, Wisner v. Vandelay Investments*, 300 Neb. 825, 916 N.W.2d 698 (2018) (superseded by statute on other grounds as stated in *Continental Resources v. Fair*, 317 Neb. 391, 10 N.W.3d 510 (2024)).

by the parties for purposes of summary judgment. Summarized, the court found the following facts were undisputed:

• The City intended to specify a standard unit for the yard waste sticker charge in Bid Package D but mistakenly failed to do so.

• There was an inconsistency in how the four bidders interpreted the requirements of Bid Package D, with three bidders basing their yard waste sticker charge on a 30-gallon unit and FCC basing its sticker charge on a 606-gallon unit.

• When the City discovered this unit discrepancy, it exercised its discretion to send FCC a bid clarification request, asking FCC to use a standardized unit of 30 gallons to calculate the yard waste sticker price, rather than using a 606-gallon unit.

• FCC agreed to clarify its bid by converting the previous sticker price of $40 for a 606-gallon unit into a sticker price of $1.98 for a 30-gallon unit.

• The price per gallon of FCC's original bid and its clarified bid was the same, at $0.066. Converting the sticker price to a standardized 30-gallon unit did not alter the total amount of FCC's bid, and it enabled the City to evaluate all four bids using the same unit of measurement.

Based on these undisputed facts, the court found the City and FCC had established a prima facie case that FCC had not materially altered its bid when responding to the clarification request[9] and that the City had not acted in bad faith or with favoritism in seeking clarification of the bid from FCC.[10] In so holding, the court applied the general rule that a municipality has discretion to seek postopening bid clarifications but should reject bids that result in a substantive change or

---

[9] See *Fairbanks, Morse & Co. v. City of North Bend*, 68 Neb. 560, 94 N.W. 537 (1903) (holding bids cannot be substantively changed after opening).

[10] See *Day v. City of Beatrice*, 169 Neb. 858, 101 N.W.2d 481 (1960) (holding court will not substitute its judgment for government entity accepting competitive bid when there is no showing entity acted arbitrarily or from favoritism, ill will, fraud, or collusion).

"material variance" that gives a substantial advantage or benefit not enjoyed by other bidders.[11]

After concluding that the City and FCC met their burden to present a prima facie case, the court found that Johnson failed to adduce any evidence showing the existence of a genuine dispute of material fact that would prevent judgment as a matter of law in favor of the City and FCC on Johnson's claim challenging the bid process. Applying the material variance test, the court concluded that Johnson did not offer any evidence showing that FCC's clarified bid based on a 30-gallon unit somehow gave FCC a substantial advantage or benefit not enjoyed by the other bidders, all of whom had also based their bid on a 30-gallon unit. And although the court acknowledged Johnson's argument that the bid clarification request itself showed favoritism, it concluded there was no evidence to support that argument, and it quoted the admonition from *Rath v. City of Sutton*[12] that "courts should normally ignore mere assertions of favoritism and waste, absent evidence to the contrary." Similarly, the court found that Johnson had not offered any evidence to create a genuine issue of fact as to whether the City acted in bad faith, noting there was no evidence offered to rebut the legal presumption that the City acted in good faith and with honest motives in seeking the bid clarification.[13]

---

[11] See, generally, 10 Eugene McQuillin, The Law of Municipal Corporations §§ 29:71 (3d ed. 2017 & Cum. Supp. 2024) (recognizing municipality may allow clarification after bids are opened but before award made) and 29:66.50 at 689 (3d ed. 2017) (recognizing test for whether bid variance is material is whether it "gives a bidder a substantial advantage or benefit not enjoyed by the other bidders").

[12] *Rath v. City of Sutton*, 267 Neb. 265, 285, 673 N.W.2d 869, 888 (2004).

[13] See *Day, supra* note 10, 169 Neb. at 865, 101 N.W.2d at 487 (when city exercises discretion to determine lowest responsible bid, "[i]t is presumed that a city council acts in good faith, with honest motives, and for the purpose of promoting the public good and protecting the public interest").

*(iii) Challenge to Rate of Yard Waste Sticker*

The district court also entered summary judgment in favor of the City and FCC on Johnson's claim that § 13-2020(4) required voter approval of the rate to be charged by FCC for yard waste stickers. The parties generally presented this as a question of statutory interpretation, and the district court treated it as such.

The district court focused on the portion of § 13-2020(4) that authorizes governing bodies to establish reasonable "rates or charges to be paid to it" and states "no city of the metropolitan class shall impose any rate or charge upon individual residences unless a majority of those voting in a regular or special election vote affirmatively to approve or authorize establishment of such a rate or charge." Construing this language, the district court held, as a matter of law, that the voter approval provision in § 13-2020(4) did not apply to FCC's yard waste sticker charge. This was so, the court reasoned, because the City was not charging or collecting the sticker fees, but, rather, the City had contracted with FCC to both administer the program and to charge residents directly for yard waste stickers. The evidence was undisputed that FCC made stickers available for purchase by residents at local retailers and that the City did not in any way pay for or subsidize the yard waste stickers.

The court found that under the ISWMA, the rates that a contractor may charge residents is governed by § 13-2020(5), which states, in relevant part:

> If the county, municipality, or agency enters into a contract with a person to provide a facility or system, such contract may authorize the person to charge the owners of premises served such a service rate therefor as the governing body determines to be just and reasonable . . . .

The district court concluded that because the yard waste sticker rate was governed by § 13-2020(5), and because the voter approval requirement for cities of the metropolitan class was included only in § 13-2020(4) and not in § 13-2020(5),

the ISWMA allowed the yard waste sticker fee to be charged by the contractor and paid to the contractor without voter approval. The court generally reasoned that if the Legislature had intended the voter approval requirement in § 13-2020(4) to apply to rates charged by contractors in § 13-2020(5), it would have included the requirement in both subsections.

From the order granting summary judgment and dismissing the operative amended complaint, Johnson filed this timely appeal. We moved the case to our docket on our own motion.

## II. ASSIGNMENTS OF ERROR

Johnson assigns, consolidated and restated, that the district court erred in (1) denying leave to file a second amended complaint adding a claim that the City lacked authority to contract with FCC-Nebraska and (2) granting summary judgment in favor of the City and FCC on Johnson's claims challenging the bidding process and the rate charged for yard waste stickers.

## III. STANDARD OF REVIEW

[1] Standing is a jurisdictional component of a party's case, because only a party who has standing may invoke the jurisdiction of a court; determination of a jurisdictional issue which does not involve a factual dispute presents a question of law.[14]

[2] An appellate court reviews a district court's denial of a motion to amend under Neb. Ct. R. Pldg. § 6-1115(a) (rev. 2025) for an abuse of discretion.[15]

[3] An appellate court reviews rulings on a motion for summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.[16]

[4] Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.[17]

---

[14] *Zeiler v. Reifschneider*, 315 Neb. 880, 1 N.W.3d 880 (2024).

[15] *Sinu v. Concordia University*, 313 Neb. 218, 983 N.W.2d 511 (2023).

[16] *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024).

[17] *Mullins v. Box Butte County*, 317 Neb. 937, 13 N.W.3d 67 (2024).

## IV. ANALYSIS

### 1. STANDING

[5,6] Although the parties' appellate briefs do not address standing, we address it as a threshold matter. Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.[18] Standing is a jurisdictional component of a party's case because only a party who has standing may invoke the jurisdiction of a court.[19]

[7] When reviewing a party's standing, a court takes different approaches depending on whether a facial challenge or a factual challenge has been presented. In *Hawley v. Skradski*,[20] we explained the difference between facial and factual challenges:

> If a motion challenging standing is made at the pleadings stage, it is considered a "facial challenge" and a court will review the pleadings to determine whether there are sufficient allegations to establish the plaintiff's standing. But if the challenge to standing, and thus the court's subject matter jurisdiction, is raised after the pleadings stage and the court holds an evidentiary hearing and reviews evidence outside the pleadings, it is considered a "factual challenge" and the party opposing the challenge must offer evidence to support its burden of establishing subject matter jurisdiction.

[8] When an appellate court reviews a trial court's decision based on a factual challenge to standing, it reviews any factual findings under the clearly erroneous standard but reviews the ultimate standing determination de novo, because it presents a question of law.[21] Here, the trial court received evidence on the issue of standing but made no express factual findings or

---

[18] *Castillo v. Libert Land Holdings 4*, 316 Neb. 287, 4 N.W.3d 377 (2024).

[19] *Preserve the Sandhills v. Cherry County*, 313 Neb. 590, 985 N.W.2d 599 (2023).

[20] *Hawley v. Skradski*, 304 Neb. 488, 494, 935 N.W.2d 212, 217 (2019).

[21] See *id*.

rulings on the issue. With no factual findings to review, we proceed directly to a de novo review of the court's implicit conclusion that Johnson established standing to bring this action either as one who suffered an injury in fact[22] or as a taxpayer seeking to enjoin the illegal expenditure of public funds.[23]

[9,10] The general common-law standing inquiry focuses on whether the party bringing the suit has suffered or will suffer an injury in fact.[24] Accordingly, to have standing to bring an action to restrain an act of a municipal body, litigants must usually show some injury peculiar to themselves.[25] In some cases, however, we have recognized exceptions to the usual requirement that a plaintiff demonstrate an injury in fact that is actual, imminent, concrete, and particularized.[26]

[11,12] One such exception is taxpayer standing.[27] Because taxpayers have an equitable interest in public funds, a resident taxpayer may bring an action to enjoin the illegal expenditure of public funds raised for governmental purposes.[28] But the mere allegation of illegal expenditure by public officials is not sufficient in itself to confer standing on a resident taxpayer.[29] Instead, to assert standing, a resident taxpayer must also

---

[22] See *In re Application A-19594*, 315 Neb. 311, 321, 995 N.W.2d 655, 667 (2023) ("[c]ommon-law standing generally focuses on whether the litigant has suffered or will suffer an injury in fact").

[23] See, *Thompson v. Heineman*, 289 Neb. 798, 857 N.W.2d 731 (2015); *Chambers v. Lautenbaugh*, 263 Neb. 920, 644 N.W.2d 540 (2002).

[24] See, *In re Application A-19594, supra* note 22; *Griffith v. Nebraska Dept. of Corr. Servs.*, 304 Neb. 287, 934 N.W.2d 169 (2019).

[25] See *id*.

[26] See *id*.

[27] See, *Thompson, supra* note 23; *Chambers, supra* note 23.

[28] See *Thompson, supra* note 23 (citing *Project Extra Mile v. Nebraska Liquor Control Comm.*, 283 Neb. 379, 810 N.W.2d 149 (2012), *overruled on other grounds, Griffith, supra* note 24 (holding common-law exceptions to injury-in-fact standing do not apply to actions brought under Administrative Procedure Act)). See, also, *Chambers, supra* note 23.

[29] *Chambers, supra* note 23.

allege that a demand was made upon the municipal or public corporation and that the demand was refused, or facts which show that such a demand would be useless.[30]

Johnson's evidence showed that at all relevant times, he owned real and personal property in Omaha and paid taxes to the City on such property. The City and FCC offered no evidence to the contrary. Johnson's evidence also showed that his Omaha residence generates more solid waste than can fit into two 96-gallon carts and that he has had to purchase stickers for disposal of additional yard waste.

We conclude this evidence sufficiently established Johnson's standing to bring this action challenging the contract as an illegal expenditure of public funds and challenging the legality of the rate established for yard waste stickers. We turn now to the merits of his assignments of error on appeal.

## 2. DENIAL OF LEAVE TO AMEND OPERATIVE COMPLAINT

Johnson assigns that the district court erred in overruling his motion seeking leave to file a second amended complaint that alleged a new theory: that the contract between the City and FCC-Nebraska should be declared void because FCC-Spain was the successful bidder and the City lacked authority to enter into a contract with FCC-Nebraska.

[13,14] It has long been the rule in Nebraska that once a responsive pleading has been filed in a civil action, a party may no longer amend its pleading as a matter of course.[31] The Nebraska Court Rules of Pleading in Civil Cases were amended effective January 1, 2025, but the version in effect

---

[30] *Id.*

[31] Compare Neb. Ct. R. Pldg. § 6-1115(a) (codified in 2008) with § 6-1115(a) (rev. 2025). See, also, *Ferer v. Aaron Ferer & Sons*, 278 Neb. 282, 770 N.W.2d 608 (2009) (holding court did not abuse its discretion in denying motion to amend complaint for purpose of adding new basis for claim when plaintiff knew about relevant facts for 5 years before seeking to amend).

when Johnson sought leave to amend his operative complaint allowed parties to amend their pleadings "once as a matter of course before a responsive pleading is served" and, thereafter, permitted amendment "only by leave of court or by written consent of the adverse party, and leave shall be freely given when justice so requires."[32] Under this standard, the general rule is that courts should grant leave to amend "absent undue delay, bad faith, unfair prejudice, or futility."[33] Stated differently, the denial of a motion seeking leave to amend pleadings is appropriate only in those limited circumstances in which undue delay, bad faith on the part of the moving party, futility of the amendment, or unfair prejudice to the nonmoving party can be demonstrated.[34]

[15,16] Ultimately, permission to amend pleadings is addressed to the sound discretion of the trial court; absent an abuse of that discretion, the trial court's decision will be affirmed.[35] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[36]

Here, the district court articulated several reasons for denying Johnson's motion to amend, but the primary reason was undue delay in seeking leave to add a new theory. The court recounted the procedural history of the case, noting that Johnson's motion to amend was filed several years into the litigation and after deadlines to amend pleadings, add parties, and complete fact discovery had expired. Moreover, the motion to amend was filed just a few days before the hearing

---

[32] § 6-1115(a) (codified in 2008).

[33] *Trausch v. Hagemeier*, 313 Neb. 538, 549, 985 N.W.2d 402, 413 (2023).

[34] See, e.g., *Sinu, supra* note 15; *Jacob v. Nebraska Bd. of Parole*, 313 Neb. 109, 982 N.W.2d 815 (2022); *McCaulley v. C L Enters*., 309 Neb. 141, 959 N.W.2d 225 (2021); *InterCall, Inc. v. Egenera, Inc.*, 284 Neb. 801, 824 N.W.2d 12 (2012).

[35] *Jacob, supra* note 34.

[36] *Id*.

on the motions and cross-motion for summary judgment and after the parties had submitted their respective briefs, evidence indexes, and statements of disputed and undisputed facts. Trial in the case was scheduled for a few weeks after the summary judgment hearing. The court also determined that Johnson's proposed new theory was not newly discovered and instead was based on facts he had known since the inception of the case. Finding that Johnson had not "proffered a satisfactory explanation for his delay in seeking to amend his complaint to add the [new theory] at this late stage of the proceedings," the court overruled his motion to amend.

[17] On this record, we do not find an abuse of discretion in the court's decision to overrule Johnson's motion to amend to add an entirely new legal theory on the eve of the summary judgment hearing. We have repeatedly held that it is not an abuse of discretion to deny leave to amend when a party seeks to add a new claim or defense after a motion for summary judgment has been heard and submitted, unless evidence or testimony exists in the record indicating that the proposed claim or defense was newly discovered or that counsel was previously unaware of the claim.[37] This is based on recognition that in the absence of evidence showing that a proposed new claim or defense was recently discovered, a request to amend the operative pleadings while the court is considering summary judgment is "merely a belated effort to inject issues of material fact into a proceeding where previously the pleadings revealed none."[38] We have applied the same reasoning when a

---

[37] See, *Parnell v. Madonna Rehab. Hosp.*, 258 Neb. 125, 602 N.W.2d 461 (1999) (finding no abuse of discretion in denying leave to amend while summary judgment pending); *Darrah v. Bryan Memorial Hosp.*, 253 Neb. 710, 571 N.W.2d 783 (1998). See, also, John P. Lenich, Nebraska Civil Procedure § 15:4 at 751 (2025) ("[a]n explanation for the party's failure to raise the new matter earlier becomes especially important if leave to amend is sought while the court is considering a motion for summary judgment").

[38] *Parnell, supra* note 37, 258 Neb. at 130, 602 N.W.2d at 465. Accord *Darrah, supra* note 37.

motion to amend is raised at the summary judgment hearing but before the motion is submitted.[39]

The same reasoning applies here. Johnson was aware of the facts supporting the proposed new theory when he filed this action in 2020, yet he waited until a few days before the summary judgment hearing in the fall of 2023 to request leave to amend the operative complaint to assert the new theory. By that time, discovery had been completed, the deadline for amending pleadings and adding parties had passed, cross-motions for summary judgment had been filed and briefed based on the issues framed in the operative complaint, and the trial was set to occur in a few weeks. On this record, the court did not abuse its discretion in finding undue delay in seeking leave to amend, and we need not address the other grounds relied upon by the court to overrule the motion for leave to amend.

### 3. SUMMARY JUDGMENT RULING

As stated, the City and FCC each filed motions for summary judgment on all remaining counts of the operative amended complaint. And Johnson filed a cross-motion motion for partial summary judgment, seeking a determination that he had taxpayer standing and a declaration that the contract between the City and FCC was void ab initio because the yard waste sticker rate charged by FCC had not been approved by the voters. The court entered summary judgment in favor of the City and FCC and dismissed the complaint in its entirety.

On appeal, Johnson assigns error to the summary judgment ruling as it regards his claim challenging the bidding process and his claim challenging the rate charged by FCC for yard waste stickers. Before addressing Johnson's assignments of error, we review the principles governing appellate review of a summary judgment ruling.

---

[39] *McCaulley, supra* note 34 (finding no abuse of discretion in denying oral motion for leave to amend made at summary judgment hearing when litigation had been pending for 5 years).

[18,19] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[40] Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[41]

[20,21] The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial.[42] If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.[43] In the summary judgment context, a fact is material only if it would affect the outcome of the case.[44]

### (a) Challenge to Bid Process

[22,23] More than a century ago, we said the object of competitive bidding statutes is "to invite competition and prevent favoritism and fraud."[45] More recently, we recognized that competitive bidding statutes are enacted for the benefit of taxpayers and "'exist to invite competition, to guard against favoritism, improvidence, extravagance, fraud, and corruption,

---

[40] *Galloway v. Husker Auto Group*, 318 Neb. 178, 14 N.W.3d 218 (2024).

[41] *Id*.

[42] *Id*.

[43] *Id*.

[44] *Id*.

[45] *Fairbanks Morse & Co., supra* note 9, 68 Neb. at 564, 94 N.W. at 539.

and to secure the best work or supplies at the lowest possible price.'"[46]

[24-27] We have recognized that public bodies exercise discretion when awarding bids under the competitive bidding process, and we have said that "courts will show deference when reviewing challenges to a public body's . . . award decisions."[47]

> "[W]here there is no showing that the body acts arbitrarily, or from favoritism, ill will, fraud, collusion, or other such motives, it is not the province of a court to interfere and substitute its judgment for that of the administrative body." . . . In other words, whenever a public body has discretion to make a decision during the bidding process, a court is essentially limited to reviewing that decision for bad faith.[48]

Additionally, public bodies also have discretion to seek clarification of bids, even after bids have been opened, so long as the bid is not substantively or materially altered. [49]

In his claim seeking to void the contract based on alleged impropriety in the bid process, Johnson alleged two related theories: (1) The City should not have accepted FCC's post-opening altered bid because that bid materially varied from FCC's original bid, and (2) the City acted with bad faith and favoritism in the bidding process by seeking a postopening clarification of FCC's bid on Bid Package D without notice to other bidders. The district court addressed both theories and found that the evidence entitled the City and FCC to summary judgment as a matter of law.

---

[46] *Rath, supra* note 12, 267 Neb. at 282, 673 N.W.2d at 886 (quoting *Anderson v. Peterson*, 221 Neb. 149, 375 N.W.2d 901 (1985)).

[47] *Rath, supra* note 12, 267 Neb. at 284, 673 N.W.2d at 887.

[48] *Id*. at 284-85, 673 N.W.2d at 887 (quoting *Best v. City of Omaha*, 138 Neb. 325, 293 N.W. 116 (1940)).

[49] See *Fairbanks, Morse & Co., supra* note 9.

On appeal, Johnson does not contend that the City lacked the general authority to exercise its discretion and seek a bid clarification postopening.[50] We therefore limit our analysis to his related contentions that (1) FCC's postopening bid materially or substantively varied from its original bid and that (2) the City demonstrated bad faith and favoritism toward FCC by requesting clarification of FCC's bid postopening.

### (i) No Evidence of Material Variance

[28] Nebraska has long recognized that bids cannot be substantively changed after opening because otherwise the purpose of competitive bidding, which is to invite competition and prevent favoritism and fraud, would be completely thwarted.[51] We applied this rule in *Fairbanks, Morse & Co. v. City of North Bend.*[52]

In *Fairbanks, Morse & Co.*, the city solicited bids for labor and materials to construct a water system. After the bids were opened, the public body declined to accept either one. But the next day, the city accepted a supplemental bid from one bidder that contained substantially new terms, including supplying additional machinery. On appeal, we found the supplemental bid was an invalid new bid, emphasizing that it "materially changed and modified" the original bid and that consequently, the bidders "were not on equal terms, and were not bidding on the same proposition."[53]

[29,30] Similarly, a leading treatise on municipal corporations states that the substance of a bid cannot be changed after the time for opening, but it emphasizes that "mere irregularities in [the] form" of a bid may still be corrected

---

[50] See, generally, 10 McQuillin, *supra* note 11, § 29:71. See, also, *Rath, supra* note 12 (holding when public body has discretion to make decision during bidding process, court will review its exercise of discretion only for bad faith).

[51] *Fairbanks, Morse & Co., supra* note 9.

[52] *Id.*

[53] *Id.* at 564, 94 N.W. at 539.

or disregarded after bids are opened.[54] This treatise generally equates a prohibited substantive change in a bid with a "material variance" in the bid and states that the test for whether a variance is material is whether it "gives a bidder a substantial advantage or benefit not enjoyed by the other bidders."[55] The district court applied this material variance test and determined there was no evidence in the record to support Johnson's claim that FCC's postopening bid clarification resulted in a material variance.

Our de novo review leads us to the same conclusion. The facts relating to Johnson's material variance argument are undisputed. The City intended to specify a standard unit for the yard waste sticker charge in Bid Package D but mistakenly failed to do so. This led to an inconsistency in how the four bidders interpreted the requirements of Bid Package D, with three bidders basing their yard waste sticker price on a 30-gallon unit and FCC basing its sticker price on a 606-gallon unit. When the City discovered this unit discrepancy, it exercised its discretion to send FCC a postopening bid clarification request, asking FCC to standardize the unit price to 30 gallons per unit, rather than 606 gallons per unit. FCC agreed to clarify its bid by converting the previous sticker price of $40 for a 606-gallon unit into a sticker price of $1.98 for a 30-gallon unit. The price per gallon of FCC's original bid and its clarified bid was the same, at $0.066. Converting the sticker price to a standardized 30-gallon unit did not alter the total amount of FCC's bid, and it enabled the City to evaluate all four bids using the same unit of measurement.

These undisputed facts show that FCC's postopening bid merely corrected what amounted to an irregularity in the unit of measurement and mathematically converted its original bid to reflect a standardized unit of 30 gallons instead of 606 gallons. Because the price per gallon remained unchanged

---

[54] See 10 McQuillin, *supra* note 11, § 29:66.50 at 688.

[55] *Id*. at 689.

from the original bid, and because the total amount of FCC's bid was not altered, there is no evidence to support the contention that this unit standardization permitted FCC to materially change the price of its yard waste sticker bid. And because all other bidders had used a 30-gallon unit to price their yard waste stickers, asking FCC to convert its bid using the same standardized unit did not give FCC any unfair or substantial advantage over the other bidders, but instead merely enabled the City to evaluate all bids using the same unit of measurement.

On this record, we agree with the district court that even when Johnson is given all reasonable inferences, there is no evidence to support Johnson's claim that FCC's clarified bid resulted in a material variance from its original bid and no evidence to support his contention that the clarified bid gave FCC a substantial advantage not enjoyed by the other bidders. The district court properly granted summary judgment in favor of the City and FCC on this claim.

### (ii) No Bad Faith or Favoritism

Johnson also argues the district court erred in granting summary judgment on his claim that the City acted in bad faith and with favoritism by seeking the postopening bid clarification from FCC. He argues the evidence "supports an inference the City surreptitiously invited a material variance"[56] of FCC's submitted bid and that this provided FCC with "the substantial advantages of an opportunity to correct their bidding error . . . and to materially revise" its bid.[57]

His argument in this regard is heavily dependent on the success of his claim that FCC's postopening bid substantially and materially varied from its original bid and that the request for bid clarification afforded FCC a substantial advantage that was not enjoyed by the other bidders. Because we have already concluded that the City and FCC were entitled to summary

---

[56] Brief for appellant at 36.

[57] *Id*. at 37.

judgment on that claim, Johnson's related claim that the City acted in bad faith and with favoritism by requesting the bid clarification similarly fails.[58] The district court did not err in entering summary judgment in favor of the City and FCC on this claim.

### 4. Voter Approval of FCC Charge Not Required

In his second assignment of error, Johnson argues the district court erred in granting summary judgment in favor of the City and FCC on his claim that the yard waste sticker program is void because the rates charged by FCC were not approved by the voters under § 13-2020(4).

Regarding this claim, the evidence was undisputed that the yard waste sticker program is administered exclusively by FCC pursuant to a contract with the City, that FCC makes the stickers available for purchase at authorized retail outlets, and that the City does not in any way pay for or subsidize the yard waste sticker program.

Johnson's claim that the yard waste sticker charge is subject to the voter approval requirement in § 13-2020(4) presents a matter of statutory interpretation that we review independently of the trial court.[59] In construing this statute, we are guided by well-settled principles.

[31-35] Statutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning.[60] It

---

[58] See, generally, *Winter Brothers v. City of Beresford*, 652 N.W.2d 99 (S.D. 2002) (reasoning no favoritism shown by public body in answering one bidder's questions when answers did not result in bidder obtaining a competitive advantage); *Cedar Bay Const. v. City of Fremont*, 50 Ohio St. 3d 19, 22, 552 N.E.2d 202, 205 (1990) (finding public body did not act in ""'"unreasonable, arbitrary or unconscionable"'"' manner by meeting with winning bidder when substantive terms of bid were not changed after meeting).

[59] See *Mullins, supra* note 17.

[60] *Dirt Road Development v. Hirschman*, 316 Neb. 757, 7 N.W.3d 438 (2024).

is not within the province of a court to read a meaning into a statute that is not warranted by the language; neither is it within the province of a court to read anything plain, direct, or unambiguous out of a statute.[61] In construing a statute, the legislative intention is to be determined from a general consideration of the whole act with reference to the subject matter to which it applies and the particular topic under which the language in question is found, and the intent as deduced from the whole will prevail over that of a particular part considered separately.[62] Statutes pertaining to the same subject matter should be construed together; such statutes, being in pari materia, must be construed as if they were one law, and effect must be given to every provision.[63] To give effect to all parts of a statute, a court will attempt to reconcile different provisions so they are consistent, harmonious, and sensible and will avoid rejecting as superfluous or meaningless any word, clause, or sentence.[64]

[36] Applying these principles, we conclude that Johnson's argument fails to properly consider the plain language of both § 13-2020(4) and § 13-2020(5) in pari materia. The voter approval requirement upon which Johnson relies is codified in § 13-2020(4), and the plain language of that subsection applies when a governing body establishes "rates or charges *to be paid to it* . . . by each person whose premises are served." (Emphasis supplied.) In this case, it is undisputed that the yard waste sticker fees are neither charged by nor paid to the City. Because the voter approval requirement in § 13-2020(4) applies only when a city of the metropolitan class imposes a rate or charge upon individual residences to be paid to the city, it does not apply here.

---

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

Instead, we agree with the district court that, under the ISWMA, the rates a contractor may charge, including the yard waste sticker fee at issue here, are governed by § 13-2020(5). The relevant provisions of § 13-2020(5) authorize the governing body of a county or municipality to enter "into a contract with a person to provide a facility or system" for solid waste management and state that such contract "may authorize the person to charge the owners of premises served such a service rate therefor as the governing body determines to be just and reasonable." Unlike § 13-2020(4), § 13-2020(5) does not contain an express requirement that service rates charged by and paid to a contractor must be approved by the voters in cities of the metropolitan class. To the extent Johnson's argument asks us to read such a provision into § 13-2020(5), his request is contrary to our well-established principles of statutory interpretation.[65]

To summarize, because the undisputed evidence established that the rates for yard waste stickers are charged by and paid to the contractor (FCC) and not to the City, the voter approval requirement in § 13-2020(4) is not applicable. In reaching this conclusion, we express no opinion on whether voter approval might be required when a city of the metropolitan class enters into a contract to provide services and then the city imposes and collects a charge or assessment on individual residences to defray the contract charges,[66] as there is no evidence that the City is doing so.

Because the voter approval provision in § 13-2020(4) does not apply to the yard waste sticker fee at issue here, the district court did not err in granting summary judgment in favor of the City and FCC on this claim.

---

[65] See *State v. Strawn*, 318 Neb. 859, 19 N.W.3d 761 (2025) (emphasizing court may not read meaning into statute not reflected in its text).

[66] See § 13-2020(5).

## V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

Affirmed.