Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/31/2025 09:11 AM CDT

Kristi Kellogg, appellee, v. Christopher Mathiesen,
appellant, and Apostle Nursing Home
Health Care, LLC, appellee.

___ N.W.3d ___

Filed October 31, 2025.    Nos. S-24-564, S-24-665.

1. **Appeal and Error.** Where the assignments of error consist of headings or subparts of arguments and are not within a designated assignments of error section, an appellate court may proceed as though the party failed to file a brief, providing no review at all, or, alternatively, may examine the proceedings for plain error.

2. **Rules of the Supreme Court: Appeal and Error.** Parties who wish to secure appellate review must abide by the rules of the Nebraska Supreme Court, and those who fail to comply with the appellate briefing rules do so at their own peril.

3. **Appeal and Error.** When reviewing proceedings for plain error, an appellate court is not constrained by the specific arguments raised in the briefs, nor is it required to consider every error that may have occurred in the lower court.

4. ____. When reviewing for plain error, an appellate court is concerned with error that is plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.

5. ____. Generally, an appellate court will find plain error only when a miscarriage of justice would otherwise occur.

6. **Jurisdiction: Appeal and Error.** Plain error review does not, and cannot, constrain an appellate court's duty to ensure that it has jurisdiction. Therefore, even when circumstances may warrant plain error review of the merits, an appellate court will analyze its jurisdiction using the same standard of review ordinarily applied to jurisdictional issues.

7. **Jurisdiction.** A jurisdictional issue that does not involve a factual dispute presents a question of law.

8. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.

9. **Jurisdiction: Final Orders: Appeal and Error.** Read together, Neb. Rev. Stat. §§ 25-1911 (Reissue 2016) and 25-1912 (Cum. Supp. 2024) generally prescribe that for an appellate court to acquire jurisdiction of an appeal, the party must be appealing from either a judgment or decree rendered or from a final order.

10. **Standing: Jurisdiction: Parties.** Standing is a jurisdictional component of a party's case, because only a party who has standing may invoke the jurisdiction of a court.

11. ____: ____: ____. Standing refers to whether a party had, at the commencement of the litigation, a personal stake in the outcome of the litigation that would warrant a court's exercise of its subject matter jurisdiction and remedial powers on that party's behalf.

12. **Standing: Parties.** To have standing, the plaintiff must have some legal or equitable right, title, or interest in the subject matter of the controversy.

Appeals from the District Court for Douglas County: Timothy P. Burns, Judge. Affirmed.

Michael C. Pettis for appellant.

Christian T. Williams, of Domina Law Group, P.C., L.L.O., for appellees.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Cassel, J.

## INTRODUCTION

Kristi Kellogg and Christopher Mathiesen, members of a limited liability company (LLC), brought derivative claims and counterclaims against one another. Following a bench trial, the district court denied the derivative claims but granted Kellogg's separate application to dissolve the company. Mathiesen appealed. After the court appointed a receiver, he filed another appeal. Because Mathiesen failed to assign error in the manner required by our rules, we review only to ensure

that we have jurisdiction and for plain error. Thus, we address Mathiesen's contention that Kellogg lacked standing because she did not possess a transferable interest in the company during the litigation. Because his argument lacks merit and we otherwise observe no plain error, we affirm.

## BACKGROUND

### Formation of Company

Mathiesen wished to start a company with Kellogg to provide in-home personal care services to clients. According to text messages between the parties, Mathiesen proposed:

> We start off as 50/50 owners, but percentages change with money invested into company.
>
> So if I put in $7,500 and you put in $2,500, then the ownership changes to 75/25, or vi[c]e versa. But we must agree about putting money in, so that one person can not simply buy out the other person without an agreement.

Mathiesen paid an online dealer of corporate business documents to produce articles of incorporation and file them with the Nebraska Secretary of State.

In June 2017, a certificate of organization for Apostle Nursing Home Health Care, LLC (Apostle), was filed with the Nebraska Secretary of State. Apostle is an LLC formed under the Nebraska Uniform Limited Liability Company Act (LLC Act).[1] Apostle's funding sources were contemplated to be "Medicaid and DHHS income," along with "private pay."

### Operating Agreement

Mathiesen also had the online dealer prepare an operating agreement, but Kellogg contends that she never signed it. Mathiesen contends that she did. According to Mathiesen, he spilled a beverage on the agreement signed by both parties,

---

[1] See Neb. Rev. Stat. §§ 21-101 to 21-197 and 21-501 to 21-542 (Reissue 2022 & Cum. Supp. 2024).

which led to mold, and that is why it was referred to in messages between the parties as the "moldy operating agreement." Mathiesen testified that "there's no signed copy because [Kellogg and her counsel] shredded it."

During trial, counsel referred to exhibit 102 as the operating agreement. Although that particular exhibit was not offered into evidence, counsel for both parties asked questions about its provisions during trial. Paragraph 2.1 of the document indicated that capital contributions and ownership percentages would be listed on an "Exhibit A." Paragraph 2.2 stated that members were not obligated to make additional capital contributions unless unanimously agreed to by all members.

## 2017 Sales Contract

In August 2017, Kellogg and Mathiesen executed a "sales contract agreement" (2017 contract). It stated that "[b]efore the effective date of 8/8/17, both parties were 50% owners" but that "[e]ffective 8/8/17, . . . Mathiesen relinquished his 50% ownership to . . . Kellogg, due to his background being grounds for denial from being a Medicaid Waiver Provider." According to the contract, Mathiesen would be able to regain his 50-percent ownership of Apostle "once [he] is able to have his assault pardoned by the Governor of Nebraska."

The 2017 contract specified that any money given or loaned to Apostle by Mathiesen would not grant him any ownership. According to Mathiesen's understanding of that contract, money loaned by Mathiesen would not carry interest be repaid at Mathiesen's discretion.

The 2017 contract addressed the roles of Kellogg and Mathiesen. It identified Kellogg as owner and chief operations officer but stated that she would not be working full time for Apostle because she had employment elsewhere as a registered nurse. Mathiesen would be hired as the chief executive officer and would work "between 51-69+ hours a week."

### 2019 Asset Purchase Agreement

On February 15, 2019, the parties entered into an asset purchase agreement (2019 contract). It stated that Kellogg, as owner of Apostle, agreed to sell to Mathiesen 50 percent of the assets of Apostle. The terms and conditions of the 2019 contract stated Kellogg would "sell, convey, transfer and assign" to Mathiesen 50 percent of Kellogg's "right, title and interest in and to" Apostle's assets. It specified that the assets included, but were not limited to, "all assets such as furniture, fixtures, inventory, customer lists, equipment, telephone numbers, all intangible rights, including but not limited to all goodwill in or arising from [Apostle] as a going concern."

The 2019 contract stated, "The total purchase price . . . for the Assets shall be one dollar." As part of the "MUTUAL REPRESENTATIONS and WARRANTIES," it stated that "past mutual interests in the success of [Apostle] qualify as good and valuable consideration with the addition of the agreed sales price of one dollar."

### Notice and Initial Lawsuit

In March 2020, Mathiesen sent Kellogg a "Notice" after he learned that Kellogg used Apostle's funds to hire a law firm. The notice directed Kellogg to seek return of money paid to the law firm or to immediately pay the money herself. It further stated that Kellogg's membership in Apostle was terminated due to failure to make a capital contribution. But the notice stated that Kellogg could retain her membership status if she made a capital contribution of $20,796.78 within 14 days.

Three days later, Apostle, through the law firm, filed a complaint against Mathiesen seeking judicial expulsion and injunctive relief. Mathiesen filed a motion to dismiss. He believed that Kellogg brought the action and alleged that she had no standing to bring the action or to sue in Apostle's name.

Following a hearing, the court entered an order in June 2020 sustaining the motion to dismiss for failure to state a claim. It found that both Kellogg and Mathiesen were 50-percent members of Apostle and that there appeared to be no legally enforceable written operating agreement. The court reasoned that although Kellogg did not have the authority to direct Apostle to bring the action, she had capacity to sue Mathiesen on behalf of Apostle in a derivative suit.

### Operative Complaint, Answer, and Counterclaim

In July 2020, Kellogg filed the operative amended complaint against Mathiesen as the defendant and identified Apostle as a nominal party. Kellogg stated that she was authorized under § 21-165 to file a derivative suit on Apostle's behalf. The complaint alleged that she and Mathiesen were 50-percent owner-members of Apostle.

Kellogg alleged various acts by Mathiesen of corporate waste, embezzlement, fraud, and threatening behavior toward Apostle employees. Based on these actions, she made claims for breach of fiduciary duty under § 21-138, wrongful disassociation under § 21-145, tortious interference with business expectancies, conversion, judicial expulsion under § 21-145, and temporary and permanent injunctions.

Mathiesen filed an answer to the amended complaint in October 2020, along with counterclaims and a cross-claim. The cross-claim was later dismissed. Mathiesen filed amended counterclaims, but he did not file an amended answer. Thus, the October 2020 answer (but not the counterclaims) remained operative. Mathiesen alleged that since Apostle's inception, he had invested approximately $70,000, had withdrawn approximately $52,000 from his capital account, and had maintained an equitable interest in Apostle of approximately $17,500. According to Mathiesen, Kellogg never invested any capital or property into Apostle.

Mathiesen purported to assert nine causes of action in his counterclaim against Kellogg. He made claims for breach of fiduciary duty and breach of the duty of loyalty, dissociation under § 21-145, tortious interference and loss of business opportunity, conversion, malicious prosecution, temporary and permanent injunction, breach of contract, defamation, and spoliation. Mathiesen asked the court to declare that he is the 100-percent owner of Apostle and that Kellogg is not a member or equitable owner. Mathiesen requested a monetary judgment against Kellogg and injunctive relief.

### Temporary Injunction

In July 2020, the district court entered a temporary injunction. It mutually restrained Kellogg and Mathiesen from acting on Apostle's behalf without the consent of the other. It also prohibited either party from withdrawing funds from bank accounts opened on behalf of Apostle without the other's consent. This injunction remained in place throughout the rest of the proceedings.

### Application for Dissolution

In June 2021, Kellogg filed a separate application for dissolution. She alleged that conduct of all or substantially all of Apostle's activities was unlawful, that it was not reasonable to carry on with Apostle's activities in conformity with the certification of organization, and that Mathiesen was acting in a manner that was illegal or fraudulent or was oppressive or harmful to Kellogg. She requested that the court judicially dissolve Apostle and that it appoint a receiver.

### Applications to Show Cause

Mathiesen filed a number of applications to show cause. His October 2020 application alleged that Kellogg had been circumventing the July 2020 mutual restraining order. The court granted the application and ordered Kellogg to appear in court to show cause why she should not be held in

contempt. Mathiesen subsequently moved to continue the contempt proceedings.

In March 2023, Mathiesen filed another application. He alleged that Kellogg had written checks on Apostle's bank account without Mathiesen's consent. Approximately 4 months later, he filed another application claiming that Kellogg was misappropriating Apostle's funds. In Mathiesen's May 2024 application, he listed $31,742.70 in funds allegedly withdrawn for Kellogg's personal benefit while the mutual injunction was in place. He also listed transactions purportedly showing that Kellogg had taken or given $31,176.86 in Apostle's funds in contravention of the court's June 2020 order. Those transactions included payments to Kellogg's counsel's law firm. The court denied the application.

## Motions for Summary Judgment

Mathiesen filed four motions for summary judgment, and Kellogg filed one such motion. In each of Mathiesen's motions, he contended that Kellogg lacked standing. The court denied the motions.

In the court's June 2022 order denying the cross-motions for summary judgment, it recognized that 2 years earlier, it held that Apostle did not have an operating agreement and that the LLC Act governed the dispute. The court stated that even if the unsigned operating agreement was valid, the 2017 contract would still result in Kellogg's being the sole member and owner of Apostle. The court found that Mathiesen transferred his entire membership and ownership interest in Apostle to Kellogg in the 2017 contract, whether analyzed using the LLC Act or the unsigned operating agreement.

## Trial

On May 13, 2024, a bench trial finally commenced. Brooke Miller, a licensed certified public accountant, testified that Apostle was treated as a "C corporation." According to Miller, if an owner of a C corporation takes money out, it is treated

as either a dividend or a shareholder loan and does not affect the ownership percentage of an owner. Miller had no opinion regarding whether Kellogg or Mathiesen were owners or whether there was a difference in ownership percentages. Miller testified that if she were Apostle's accountant, she would inform Kellogg that Kellogg owes Apostle approximately $34,000.

Apostle's accountant testified that he does not determine equitable ownership based on capital contributions and that ownership is determined based on the articles of organization. The accountant did not have concerns about expenses incurred by Kellogg and did not see any indication that Mathiesen was using company funds to pay personal expenses.

Mathiesen testified that there was an equity agreement that converted his loans to Apostle back to capital contributions. He claimed that Kellogg "destroyed" that document.

Mathiesen contended that Kellogg lost her membership in Apostle on May 22, 2019, when she used Apostle's funds to pay $401 for her personal utility bill. Mathiesen explained his understanding of the parties' ownership if an individual had $1 of transferable interest and took out $401:

> That transaction would be kind of split in two because if they only have $1 of transferable interest, they can only take away $1 transferable interest. There is no other transferable interest to pull away from. So that one would go to zero.
>
> And then the second part of it would be the rest of the $400 charge. So at that moment, it would transfer the transferable interest of $1 and they would be left with a $400 debt. But if they paid the $401 back, then they would regain their $1 of transferable interest and regain their standing.

Mathiesen testified that Kellogg was a member without a transferable interest until he "voted out" Kellogg on March 24, 2020. Although Mathiesen testified in his deposition that the 2019 contract had nothing to do with membership status,

he changed his mind at trial to agree with the district court's summary judgment finding that equity was encompassed within "intangible rights" identified in the 2019 contract.

The parties disputed whether an operating agreement existed and had been signed. Kellogg testified that there was no operating agreement, and she did not recall signing a document purporting to be one. Mathiesen produced an operating agreement, but it was not signed by Kellogg. He explained that he spilled a beverage on startup paperwork for Apostle, including an operating agreement, and those documents acquired mold. According to Mathiesen, Kellogg signed the operating agreement that later acquired mold on it. In October 2019, the parties exchanged text messages referring to paperwork that had mold on it.

Kellogg testified that it was "impossible" to work with Mathiesen. In a deposition, Mathiesen testified that there was no logical reason why he and Kellogg should continue to be in business together. Apostle's accountant did not feel that Kellogg and Mathiesen should be working together with the company.

Kellogg felt that Mathiesen represented a risk to Apostle's clients. Evidence established that Mathiesen engaged in inappropriate behavior with a client of Apostle who suffered from significant disabilities. Mathiesen's wife, who was not an Apostle employee, drove Mathiesen and the client in the company's van to a party where the client ingested illegal drugs. At trial, Mathiesen admitted to engaging in oral sex with this same client; he denied any sexual activity in his deposition. Three Apostle employees were terminated from employment based on their reports that Mathiesen was having a sexual relationship with the client. The employees filed a lawsuit alleging that Mathiesen wrongfully terminated their employment in retaliation for making a lawful report. Apostle settled the lawsuit for $30,000. In connection with the lawsuit, Apostle paid $5,000 for its attorney fees and $2,250 for an investigation.

Testimony was adduced about Jeremy Jorgenson's role with Apostle. At times, he was characterized as a "W-2 employee" and at other times as an independent contractor. Jorgenson was unable to be a caregiver because he could not pass the background check, and he could not interact with client files because he had no "HIPAA training." Kellogg testified that Jorgenson did nothing for Apostle but that Apostle had paid him over $228,000.

### July 2024 Order and Appeal

On July 19, 2024, the court entered what it styled as an order. It found that Kellogg and Mathiesen were 50-percent co-owners or managers of Apostle. The court found that "Mathiesen's contention that an unproduced equity agreement was simultaneously signed by the parties is not credible." The court further stated, "In rectifying what Kellogg's and Mathiesen's intentions were in entering into these two contracts, it is clear beyond all doubt that they were subverting Mathiesen's ineligibility from receiving a Medicaid waiver." Because neither party had "'clean hands,'" the court denied all of their derivative causes of action.

The court then turned to whether Apostle should be dissolved. It stated that Mathiesen had "continually acted with oppressive behavior," had engaged in fraudulent behavior by paying $228,461.31 to an employee who "provided Apostle with zero worth," and had been sexually involved with a client of Apostle that resulted in a judgment against Apostle. The court stated that Apostle must be dissolved and possibly sold. The order stated:

> **IT IS THEREFORE ORDERED** that all the causes of action of Kellogg and Mathiesen are overruled and denied.
>
> **IT IS FURTHER ORDERED** that the application of Kellogg to dissolve Apostle and possibly sell it is sustained and granted.

**IT IS FURTHER ORDERED** that a receiver shall be appointed pursuant to Neb. Rev. Stat. § 25-1081 to oversee the dissolution and possible sale of Apostle. A hearing to determine the appointment of a receiver is set for [a date and time in August 2024].

**IT IS FURTHER ORDERED** that any claim for relief made by either party which is not explicitly granted in this Order is overruled and denied.

On July 26, 2024, Mathiesen filed notice of his intent to appeal the July 19 order. This appeal was docketed in the Nebraska Court of Appeals as case No. A-24-564.

### Order of Receiver Appointment and Appeal

On August 13, 2024, the court entered an order on the appointment of a receiver. It appointed a receiver and gave instructions to the receiver. The court stated: "Because Mathiesen has filed an appeal, the Receiver shall not take steps to wind up and dissolve the company or otherwise sell it. The Court will issue additional instructions following resolution of the appeal."

On September 6, 2024, Mathiesen appealed from the order appointing a receiver. This appeal was docketed in the Court of Appeals as case No. A-24-665.

Kellogg moved to consolidate the appeals for briefing, and the Court of Appeals sustained the motion. We subsequently moved the consolidated appeals to our docket.[2]

### ASSIGNMENTS OF ERROR

Mathiesen's brief does not comply with our court rules regarding assignments of error. Neb. Ct. R. App. P. § 2-109(D)(1) (rev. 2024) governs the mandatory content of an appellant's brief. It provides, "The brief of appellant . . . shall contain the following sections, under appropriate

---

[2] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2024).

headings, and in the order indicated . . . ."[3] The order speci-fied is the title page, a table of contents, a statement of the basis of jurisdiction, a statement of the case, a statement of each error a party contends was made by the trial court, prop-ositions of law, a statement of facts, a summary of the argu-ment, and arguments.[4] Mathiesen did not include an assign-ments of error section; instead, he listed errors in the table of contents section.

[1] In a prior appeal to this court between the same parties, Mathiesen's brief contained the same deficiency.[5] We stated that his brief "lack[ed] an assignments of error section."[6] We cautioned that where the assignments of error consist of head-ings or subparts of arguments and are not within a designated assignments of error section, an appellate court may proceed as though the party failed to file a brief, providing no review at all, or, alternatively, may examine the proceedings for plain error.[7] There, the lack of an assignments of error section was not consequential because our analysis began and ended with a determination that we lacked jurisdiction.

[2] Here, ramifications flow from Mathiesen's disre-gard of our warning about the need to place assignments of error within the proper designated section. Parties who wish to secure appellate review must abide by the rules of the Nebraska Supreme Court, and those who fail to comply with the appellate briefing rules do so at their own peril.[8] As we warned in the earlier appeal, we opt to limit our review to plain error due to the briefing deficiency.

---

[3] § 2-109(D)(1).

[4] See *id.*

[5] See *Mathiesen v. Kellogg*, 315 Neb. 840, 1 N.W.3d 888 (2024).

[6] *Id.* at 847, 1 N.W.3d at 895.

[7] *Mathiesen v. Kellogg, supra* note 5.

[8] *State ex rel. Hilgers v. Evnen*, 318 Neb. 803, 19 N.W.3d 244 (2025).

[3-5] When reviewing proceedings for plain error, we are not constrained by the specific arguments raised in the briefs, nor are we required to consider every error that may have occurred in the lower court.[9] Instead, when reviewing for plain error, an appellate court is concerned with error that is plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[10] Generally, an appellate court will find plain error only when a miscarriage of justice would otherwise occur.[11]

[6] Before conducting our plain error review, we address two jurisdictional arguments. One is whether appellate jurisdiction has vested in this court. The other concerns standing. When considering these jurisdictional issues, we do not apply a plain error standard of review, because plain error review does not, and cannot, constrain an appellate court's duty to ensure that it has jurisdiction. Therefore, even when circumstances may warrant plain error review of the merits, an appellate court will analyze its jurisdiction using the same standard of review ordinarily applied to jurisdictional issues.[12]

## STANDARD OF REVIEW

[7] A jurisdictional issue that does not involve a factual dispute presents a question of law.[13]

## ANALYSIS

### Appellate Jurisdiction

[8,9] Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] See *Johnson v. City of Omaha*, 319 Neb. 402, 23 N.W.3d 420 (2025).

jurisdiction over the matter before it.[14] Read together, Neb. Rev. Stat. §§ 25-1911 (Reissue 2016) and 25-1912 (Cum. Supp. 2024) generally prescribe that for an appellate court to acquire jurisdiction of an appeal, the party must be appealing from either a judgment or decree rendered or from a final order.[15]

This case is procedurally unusual. An application to dissolve an LLC was filed in an existing case involving a derivative action and counterclaim, and the court tried the matters together. Clearly, the derivative claims and counterclaims were asserted in an "action."[16] We have described the granting of dissolution of an LLC and appointment of a receiver as a special proceeding.[17] Thus, the matter here proceeded simultaneously upon an action and a special proceeding.

As to the derivative claims, the July 19, 2024, filing represented a final determination of the parties' rights in that action. As such, it was a judgment.[18] A week later, Mathiesen filed a notice of appeal. Because the July 19 filing was a judgment as to the derivative claims, we have appellate jurisdiction of the judgment in case No. S-24-564.

In the same filing setting forth the judgment on the action, the court addressed the dissolution special proceeding. The court granted dissolution of the company and stated that a receiver shall be appointed to oversee the dissolution, but

---

[14] *Khaitov v. Greater Omaha Packing Co.*, 319 Neb. 932, 25 N.W.3d 739 (2025).

[15] *Id.*

[16] See *Tegra Corp. v. Boeshart*, 311 Neb. 783, 976 N.W.2d 165 (2022) (action is any proceeding in court by which party prosecutes another for enforcement, protection, or determination of right or redress or prevention of wrong involving and requiring pleadings, process, and procedure provided by statute and ending in final judgment).

[17] See *Schreiber Bros. Hog Co. v. Schreiber*, 312 Neb. 707, 980 N.W.2d 890 (2022).

[18] See Neb. Rev. Stat. § 25-1301(1) (Cum. Supp. 2024).

the court set the appointment for a future hearing. Because the court reserved the appointment of a receiver, the dissolution aspect of the matter remained interlocutory.[19]

Once the court actually named a receiver and provided instructions, Mathiesen filed an appeal from that order. Because the appointment of a receiver is a final order,[20] we also have jurisdiction over the order in case No. S-24-655.

## Standing

[10-12] Standing is a jurisdictional component of a party's case, because only a party who has standing may invoke the jurisdiction of a court.[21] Standing refers to whether a party had, at the commencement of the litigation, a personal stake in the outcome of the litigation that would warrant a court's exercise of its subject matter jurisdiction and remedial powers on that party's behalf.[22] To have standing, the plaintiff must have some legal or equitable right, title, or interest in the subject matter of the controversy.[23]

The crux of Mathiesen's standing argument is that Kellogg did not own a transferable interest in Apostle at any time during the litigation and that she was therefore statutorily barred from bringing her claims. We disagree.

Statutes within the LLC Act authorize derivative actions. A member of an LLC may maintain a derivative action to enforce a right of the LLC.[24] Generally, such an action may be maintained only by a person who is a member at the time

---

[19] See *Evert v. Srb*, 308 Neb. 895, 957 N.W.2d 475 (2021) (when cause is retained for further action, it is interlocutory and nonappealable).

[20] See *Robertson v. Southwood*, 233 Neb. 685, 447 N.W.2d 616 (1989). See, also, Neb. Rev. Stat. § 25-1090 (Reissue 2016).

[21] *Nebraska Firearms Owners Assn. v. City of Lincoln*, 319 Neb. 723, 24 N.W.3d 891 (2025).

[22] *Id.*

[23] *Id.*

[24] § 21-165.

the action is commenced and who remains a member while the action continues.[25]

There is no dispute that Kellogg was a member of Apostle at one time. We observe that "[a] person may become a member without acquiring a transferable interest and without making or being obligated to make a contribution to the [LLC]."[26] Further, a contribution does not have to be economic; it can consist of services performed to benefit the LLC.[27] Thus, a member's interest in an LLC is divided into economic rights, which can be transferred, and governance rights, which generally cannot be transferred.[28]

The dispute is whether Kellogg ceased to be a member when, prior to filing this lawsuit, she used Apostle's funds to pay a personal utility bill. According to Mathiesen, Kellogg had a $1 transferable interest by virtue of the 2019 contract, which she lost when she paid a $401 personal utility bill. We find no support for his argument in the LLC Act.

The LLC Act defines key terms. A "[t]ransferable interest means the right, as originally associated with a person's capacity as a member, *to receive distributions* from a[n LLC] in accordance with the operating agreement, whether or not the person remains a member or continues to own any part of the right."[29] A "[d]istribution, except as otherwise provided in [§ 21-134(g)], means a transfer of money or other property from a[n LLC] to another person on account of a transferable interest."[30]

---

[25] See § 21-166(a).

[26] § 21-130(d).

[27] See § 21-131.

[28] See 54 C.J.S. *Limited Liability Companies* § 44 (2020). See, also, *Zokaites v. Pittsburgh Irish Pubs, LLC*, 962 A.2d 1220 (Pa. Super. 2008).

[29] § 21-102(24) (emphasis supplied).

[30] § 21-102(6).

Based on these definitions, we have considerable doubt that using funds of an LLC to pay a member's personal bill falls within the definition of distribution. Kellogg's use of Apostle's funds to pay her personal utility bill was not done on account of her right to receive distributions; rather, it was, at most, a misuse of the LLC's funds. "Misappropriations of limited liability funds for a member's personal use are not 'distributions.'"[31] As a bankruptcy court explained, while a misappropriation of funds by a member, like a distribution, involves taking money from the LLC, the nature of the transfers is different.[32]

Another flaw in Mathiesen's argument is his contention that 50 percent of all of Apostle's assets—which the 2019 contract identified as including, but not limited to, all of its furniture, fixtures, and equipment—was worth only $1. We conclude that Kellogg remained a member at the time of filing her derivative action. As a member, she had standing.

## No Plain Error

Although reviewing for plain error only, we observe that Mathiesen purported to assign 12 errors. A theme throughout his arguments on the various issues is that Kellogg lacked standing to bring a derivative action—an issue we have addressed and rejected. Having reviewed the voluminous record, we see nothing rising to the level of plain error.

## CONCLUSION

For the reasons provided above, we conclude the following:
• Mathiesen's appeals from both the July 2024 judgment determining the derivative claims and the August 2024 order appointing a receiver vested this court with appellate jurisdiction over both appeals.

---

[31] 54 C.J.S., *supra* note 28, § 46 at 579.

[32] See *In re Young*, 384 B.R. 94 (D.N.J. 2008).

• Kellogg, as a member of the LLC during the litigation, had
  standing to bring the derivative action on behalf of Apostle.
Seeing no error plainly evident from the record, we affirm the
district court's judgment in case No. S-24-564 and its order
appointing a receiver in case No. S-24-665.

AFFIRMED.