Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/21/2026 08:08 AM CDT

Alicia G. Dunham, now known as Alicia G.
Murphy, appellant, v. Daniel R.
Dunham, appellee.

___ N.W.3d ___

Filed April 21, 2026.    Nos. A-25-176, A-25-177, A-25-337, A-25-338.

1. **Parental Rights: Judgments: Appeal and Error.** Termination of parental rights cases raised under Neb. Rev. Stat. § 42-364(5) (Cum. Supp. 2024) are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the lower court's findings.

2. **Evidence: Appeal and Error.** When the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.

3. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.

4. ____: ____. When an appellate court is without jurisdiction to act, the appeal must be dismissed.

5. **Jurisdiction: Final Orders: Appeal and Error.** Read together, Neb. Rev. Stat. § 25-1911 (Reissue 2016) and Neb. Rev. Stat. § 25-1912 (Cum. Supp. 2024) generally prescribe that for an appellate court to acquire jurisdiction of an appeal, the party must be appealing from either a judgment or decree rendered or from a final order.

6. **Final Orders: Appeal and Error.** Under Neb. Rev. Stat. § 25-1902 (Cum. Supp. 2024), the four types of final orders which may be reviewed on appeal are (1) an order which affects a substantial right in an action and which in effect determines the action and prevents a judgment, (2) an order affecting a substantial right made during a special proceeding, (3) an order affecting a substantial right made on summary application in an action after a judgment is rendered, and (4) an order denying a motion for summary judgment when such motion

is based on the assertion of sovereign immunity or the immunity of a government official.

7. **Juvenile Courts: Appeal and Error.** A proceeding before a juvenile court is a special proceeding for appellate purposes.

8. **Final Orders: Words and Phrases.** A substantial right is an essential legal right, not a mere technical right.

9. **Final Orders.** It is not enough that the right itself be substantial; the effect of the order on that right must also be substantial.

10. **Final Orders: Appeal and Error.** Whether the effect of an order is substantial depends on whether it affects with finality the rights of the parties in the subject matter.

11. **Parental Rights: Proof.** Terminating parental rights requires both clear and convincing evidence that one of the statutory grounds enumerated in Neb. Rev. Stat. § 43-292 (Reissue 2016) exists and clear and convincing evidence that termination is in the best interests of the children.

12. **Parental Rights.** Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child.

13. **Parental Rights: Words and Phrases.** Termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. With such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort.

Appeals in Nos. A-25-176 and A-25-337 from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge, and Nos. A-25-177 and A-25-338 from the Separate Juvenile Court of Sarpy County: JONATHON D. CROSBY, Judge. Appeals in Nos. A-25-176, A-25-177, and A-25-337 dismissed. Judgment in No. A-25-338 affirmed.

Wendy A. Wussow, Angela F. Schmit, and Michael W. Milone, of Koukol Johnson Schmit & Milone, L.L.C., for appellant.

John Andrew McWilliams and Kristina B. Murphree, of Gross Welch Marks Clare, P.C., L.L.O., for appellee.

MOORE, BISHOP, and WELCH, Judges.

Bishop, Judge.

## I. INTRODUCTION

Alicia G. Dunham, now known as Alicia G. Murphy, filed a petition to terminate the parental rights of her ex-husband, Daniel R. Dunham, to their two children. Although filed in the Sarpy County District Court, the court granted Alicia's request that her petition be transferred to the separate juvenile court of Sarpy County pursuant to Neb. Rev. Stat. § 42-364(5) (Cum. Supp. 2024). After a trial, the juvenile court found that Alicia failed to meet her burden to show that termination of Daniel's parental rights was in the children's best interests. It dismissed her petition and "transferred" the case back to the district court. Alicia appeals the juvenile court's order. After concluding we have jurisdiction over that final order, we affirm.

## II. BACKGROUND

Alicia and Daniel were married in Iowa in 2013 and are the parents of twins (a son and a daughter) born in 2015. Alicia filed a petition for dissolution of marriage in November 2019.

### 1. Iowa Divorce

On January 4, 2022, an Iowa district court entered a "Default Decree for Dissolution of Marriage." The decree acknowledged that Alicia was living in Nebraska, "having recently relocated" from Iowa. Pursuant to the decree, Alicia was awarded sole legal custody and primary physical custody of the parties' children. The Iowa court noted a history of domestic abuse and acknowledged that the parties had been abiding by a "criminal no-contact order" that prohibited Daniel from having contact with Alicia or their children. (As part of Daniel's separate criminal case for stalking and child endangerment, a no-contact order was entered on January 25, 2021; on November 5, it was continued for a period of 5 years and was set to expire on November 5, 2026.) The divorce decree awarded Daniel "visitation" pursuant to a phased-in "parenting schedule" (beginning with video or telephone calls and progressing to in-person supervised visits); the parties

were to work together to request a modification of the criminal no-contact order. Daniel was ordered to complete a substance abuse evaluation and follow its recommendations, and he was to successfully complete a parenting course and a domestic abuse program. Additionally, he was ordered to pay $2,061.68 per month for child support. In July 2023, Daniel's child support obligation was modified to $75 per month.

As will be discussed later in this opinion, Daniel has been incarcerated in Iowa since January 26, 2022.

### 2. Nebraska District Court Proceedings

Alicia and the children moved to Nebraska on January 1, 2022, 3 days before the entry of the default divorce decree. She subsequently remarried in 2023.

On February 2, 2024, Alicia filed an "Amended Complaint to Register and Enforce Foreign Child Custody Determination and Foreign Child Support Order" with the Sarpy County District Court in Nebraska. She requested that the district court (1) register Iowa's January 2022 default decree and the July 2023 modification of child support, (2) enforce and modify the child custody determination, and (3) enforce the child support order and collect the child support arrearages. Alicia alleged that the parties were currently involved in a separate action in the county court for Sarpy County for the stepparent adoption of the parties' children. On March 11, 2024, she filed a motion to assume jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act, asking the district court to assume jurisdiction from the Iowa court and noting that a motion to relinquish jurisdiction had been filed in the Iowa court. On April 10, the district court entered an order confirming registration of the foreign child custody determination and child support order but overruling the motion to assume jurisdiction "at this juncture."

On April 11, 2024, Alicia filed a petition in the district court for the termination of Daniel's parental rights to the parties' children. She claimed that Daniel's parental rights

should be terminated pursuant to various subsections of Neb. Rev. Stat. § 43-292 (Reissue 2016), specifically subsections (1) (abandonment), (2) (substantial and continuous or repeated neglect), (3) (neglect to pay for juvenile's subsistence, education, or other care that was court ordered), (4) (unfitness by reason of habitual use of intoxicating liquor or narcotic drugs), (5) (inability to discharge parental responsibilities because of mental illness or mental deficiency), and (9) (aggravated circumstances). She alleged that Daniel, who was currently incarcerated on a 20-year sentence in Iowa, was unfit to parent and that it was in the children's best interests to terminate his parental rights. Alicia requested that, pursuant to § 42-364(5), the district court transfer jurisdiction over the petition of termination of parental rights to the juvenile court, unless the district court found that the county court was a more appropriate forum given the pending adoption matter.

On May 21, 2024, the Iowa court entered an order wherein it "decline[d] to exercise its continuing jurisdiction to make child-custody determinations" after it found that "Iowa is an inconvenient forum and that it is appropriate for the court in Nebraska to exercise jurisdiction."

On May 23, 2024, Daniel filed his answer and "Counter Complaint" in the Sarpy County District Court wherein he sought joint legal and physical custody of the parties' children, as well as a modification of the parenting plan. That same day, Daniel also filed a motion for temporary orders and motion to compel parenting time.

On June 3, 2024, Alicia filed a motion to stay all child custody proceedings "pending resolution from the separate Juvenile Court . . . on the Petition for Termination of Parental Rights." That same day, Alicia also filed a motion to transfer to juvenile court pursuant to § 42-364(5), noting her motion to stay further child custody proceedings pending the disposition of the termination of parental rights proceedings; however, "[i]n the alternative to staying further child custody proceedings," she "move[d] for an order transferring all child custody

proceedings to the separate Juvenile Court . . . , including the Answer and Counter Complaint" filed by Daniel. On July 11, the district court granted the transfer and ordered the clerk of the district court to "transfer this case" to the juvenile court pursuant to § 42-364(5).

### 3. Juvenile Court Proceedings

On July 22, 2024, Alicia filed a "Motion to Stay Custody Modification Action Pending Termination of Parental Rights Action." On August 5, Daniel filed a motion for temporary orders and motion to compel parenting time.

On August 22, 2024, the juvenile court reappointed Daniel's attorney as court-appointed counsel. It also granted Alicia leave to amend the petition to terminate parental rights to strike § 43-292(5) (inability to discharge parental responsibilities because of mental illness or mental deficiency).

A hearing on the petition to terminate Daniel's parental rights was held in the juvenile court over the course of 4 days in October 2024. Daniel appeared at the hearing telephonically because he was incarcerated. Alicia and Daniel both testified at the hearing and called witnesses to testify on their behalf, and numerous exhibits were received into evidence. The testimony and evidence will be discussed later in our analysis.

On December 6, 2024, Daniel's attorney filed a motion for attorney fees for court-appointed services rendered and expenses incurred.

In its order entered on February 11, 2025, the juvenile court found that Alicia failed to meet her burden to show that termination of Daniel's parental rights was in the children's best interests. The court also found that "[w]hether [Daniel] will be fit to parent or even have contact with the children when he is released from custody remains to be seen" and that "[t]he District Court can tailor a safety plan and issue orders limiting or excluding contact with [Daniel] should he be released." The juvenile court's order stated:

IT IS THEREFORE ORDERED that the Petition for Termination of Parental Rights filed on April 11, 2024, is hereby dismissed.

IT IS FURTHER ORDERED that in all other respects, unless specifically modified by this Order, the prior orders of the District Court shall remain in full force and effect. Any other claims for relief not specifically granted by this Order are overruled and dismissed without prejudice.

IT IS FURTHER ORDERED that this case is transferred back to the District Court of Sarpy County, Nebraska, upon entry of this order on today's date.

IT IS FURTHER ORDERED that all costs associated with the termination of parental rights adjudication shall be paid by the District Court.

On February 20, 2025, Daniel filed an amended motion to alter or amend judgment and request for hearing. He requested that the juvenile court amend the February 11 order to read, in pertinent part: "'IT IS FUTHER ORDERED that all costs associated with the termination of parental rights adjudication other than Father's court appointed attorney fees shall be paid by the District Court. The Sarpy County Separate Juvenile Court shall be responsible for Father's court appointed attorney fees.'"

On March 7, 2025, Alicia filed her notices of appeal in case Nos. A-25-176 (captioned in district court) and A-25-177 (captioned in juvenile court).

On April 10, 2025, Daniel filed a withdrawal of his amended motion to alter or amend judgment. On April 22, the juvenile court entered an order of withdrawal, finding: "IT IS THEREFORE ORDERED that the Amended Motion to Alter or Amend Judgement is hereby withdrawn and no further hearing will be held on this matter."

On May 2, 2025, Alicia filed her notices of appeal in case Nos. A-25-337 (captioned in district court) and A-25-338 (captioned in juvenile court).

In response to various motions and objections, this court ordered the four appeals consolidated for briefing and disposition.

## III. ASSIGNMENTS OF ERROR

Alicia assigns, consolidated and restated, that the juvenile court erred by (1) failing to consider and find a statutory basis for terminating Daniel's parental rights, specifically, abandonment for 6 months or more, failing to provide necessary parental care and protection, failing to provide financial support, habitual use of intoxicating liquor or narcotic drugs, and subjecting the children to aggravated circumstances; (2) failing to find that termination of Daniel's parental rights was in the best interests of the children and dismissing Alicia's petition on that basis; and (3) immediately transferring the case back to the district court without any notice, hearing, or input from the parties following an order concluding a discrete phase of a special proceeding.

## IV. STANDARD OF REVIEW

[1,2] Termination of parental rights cases raised under § 42-364(5) are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the lower court's findings. *Benjamin S. v. Crystal S.*, 313 Neb. 799, 986 N.W.2d 492 (2023). However, when the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## V. ANALYSIS

### 1. Jurisdiction

[3,4] Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *Kellogg v. Mathiesen*, 320 Neb. 223, 26 N.W.3d 651 (2025). See, also, *In re Interest of Johnny H.*, 320 Neb. 675, 29 N.W.3d 808 (2026). When an

appellate court is without jurisdiction to act, the appeal must be dismissed. *In re Interest of Ricardo T. et al.*, 315 Neb. 718, 999 N.W.2d 562 (2024).

Most proceedings seeking termination of parental rights fall within the jurisdiction of the juvenile courts. See Neb. Rev. Stat. § 43-247(6) (Cum. Supp. 2024). Such jurisdiction is concurrent with the county court or district court. *Christine W. v. Trevor W.*, 303 Neb. 245, 928 N.W.2d 398 (2019).

[5] Neb. Rev. Stat. § 25-1911 (Reissue 2016) states that "[a] judgment rendered or final order made by the district court may be reversed, vacated, or modified for errors appearing on the record." Neb. Rev. Stat. § 25-1912 (Cum. Supp. 2024) describes the procedure for obtaining a "reversal, vacation, or modification of judgments and decrees rendered or final orders made by the district court." Together, these statutes generally prescribe that for an appellate court to acquire jurisdiction of an appeal, the party must be appealing from either a judgment or decree rendered or from a final order. *Khaitov v. Greater Omaha Packing Co.*, 319 Neb. 932, 25 N.W.3d 739 (2025). See, also, Neb. Rev. Stat. § 43-2,106.01(1) (Reissue 2016) (any final order or judgment entered by juvenile court may be appealed to Court of Appeals in same manner as appeal from district court to Court of Appeals).

[6] Pursuant to Neb. Rev. Stat. § 25-1902(1) (Cum. Supp. 2024):

The following are final orders which may be vacated, modified, or reversed:

(a) An order affecting a substantial right in an action, when such order in effect determines the action and prevents a judgment;

(b) An order affecting a substantial right made during a special proceeding;

(c) An order affecting a substantial right made on summary application in an action after a judgment is entered; and

(d) An order denying a motion for summary judgment when such motion is based on the assertion of sovereign immunity or the immunity of a government official.

We directed the parties to address specific questions in the jurisdiction section of their briefs. We will set forth the relevant questions as appropriate below.

### (a) Appeals From Juvenile Court Order

#### (i) File Stamps on Notices of Appeal

In our direction to the parties, we noted that Alicia's notices of appeal filed in case Nos. A-25-177 and A-25-338 identified the juvenile court in the caption, but "were file-stamped in the district court." We asked the parties if the filing of the notice of appeal in the district court, rather than in the juvenile court, impacted this court's jurisdiction over those appeals. The parties contend that these two notices of appeal were properly filed in the juvenile court.

On the notices of appeal in case Nos. A-25-177 and A-25-338, the file stamp reads:

Filed in Sarpy District Court
*** EFILED ***
Case Number: [juvenile case number]
Transaction ID: [number]
Filing Date: [date and time]

Thus, on the surface, it appears that these notices of appeal were filed in the wrong court.

However, a closer look at the transcripts reveals that every electronic file stamp appearing on the juvenile court filings reads as noted above; however, the manual file stamp on documents reads:

FILED
SARPY COUNTY SEPARATE JUVENILE COURT
[date and time]
[signature]
CLERK DISTRICT COURT

The manual file stamp clearly shows that the filings in the juvenile court were done by the clerk of the district court. Therefore, while the electronic file stamps on the notices of appeal are misleading, any discrepancy can be explained by a comparison of the electronic and manual file stamps in the transcripts. Accordingly, we agree with the parties that the notices of appeal in case Nos. A-25-177 and A-25-338 were filed in the juvenile court.

### (ii) Final, Appealable Order?

We also asked the parties to address whether the juvenile court's February 11, 2025, order was a final, appealable order, even though custody and parenting time issues remained pending.

Alicia claims that the juvenile court's February 11, 2025, order was a final, appealable order, because it affected a substantial right made during a special proceeding. See § 25-1902(1)(b).

[7] Nebraska case law establishes that a proceeding before a juvenile court is a special proceeding for appellate purposes. See, *In re Interest of Manuel C. & Mateo S.*, 314 Neb. 91, 988 N.W.2d 520 (2023), *modified on denial of rehearing* 314 Neb. 580, 991 N.W.2d 305; *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). Therefore, the threshold jurisdiction question is whether the juvenile court's February 11, 2025, order declining to terminate Daniel's parental rights was an order "affecting a substantial right made during a special proceeding" within the meaning of § 25-1902(1)(b).

[8-10] A substantial right is an essential legal right, not a mere technical right. *In re Interest of Johnny H.*, 320 Neb. 675, 29 N.W.3d 808 (2026). And the Nebraska Supreme Court has said it is not enough that the right itself be substantial; the effect of the order on that right must also be substantial. *Id.* Whether the effect of an order is substantial depends on whether it affects with finality the rights of the parties in the subject matter. *Id.* See, also, *In re Interest of*

*Manuel C. & Mateo S., supra* (substantial right is affected if order affects subject matter of litigation, such as diminishing claim or defense that was available to appellant prior to order from which appeal is taken).

Here, in its February 11, 2025, order, the juvenile court declined to terminate Daniel's parental rights after finding that Alicia failed to meet her burden to show that termination was in the children's best interests. The appellate courts have previously addressed the merits of an appeal of a juvenile court's order declining to terminate parental rights. See, *In re Interest of Isabel P. et al., supra* (finding appellate court had jurisdiction over State's appeal of order declining to terminate father's parental rights); *In re Interest of Joseph S. et al.*, 21 Neb. App. 706, 842 N.W.2d 209 (2014) (addressing merits of State's appeal of order denying petition to terminate parental rights), *reversed on other grounds* 288 Neb. 463, 849 N.W.2d 468. Accordingly, we agree with Alicia that the February 11 order declining to terminate Daniel's parental rights affected a substantial right with the type of finality required to create a final, appealable order under § 25-1902(1)(b).

That said, Daniel timely filed an amended motion to alter or amend the judgment. After Daniel filed his motion, but still within 30 days of the juvenile court's February order, Alicia filed a notice of appeal in case No. A-25-177.

Because Daniel filed his amended motion to alter or amend judgment in the juvenile court after the juvenile court's order indicated it was transferring jurisdiction back to the district court, we asked the parties to address two questions. First, what impact, if any, did the amended motion to alter or amend have on the finality of the February 11, 2025, order? Second, to the extent the motion tolled the time to appeal, did the juvenile court's April 22, 2025, order withdrawing the motion sufficiently dispose of the motion? Both parties concluded that regardless of the transfer back to the district court or Daniel's amended motion to alter or amend, which was later withdrawn, this court has jurisdiction over one of the appeals

from the juvenile court, either case No. A-25-177 (filed within 30 days of the February 11 order) or case No. A-25-388 (filed within 30 days of the April 22 order), both of which appeal the merits of the juvenile court's February 11 order declining to terminate Daniel's parental rights. For the reasons stated below, we agree that this court has jurisdiction.

Daniel filed an amended motion to alter or amend judgment within 10 days of the juvenile court's February 11, 2025, order. See Neb. Rev. Stat. § 25-1329 (Reissue 2016) (motion to alter or amend shall be filed no later than 10 days after entry of judgment). Therefore, regardless of the juvenile court's order indicating the transfer back to the district court, the timely filed motion to alter or amend remained under the jurisdiction of the juvenile court. At that point, we consider § 25-1912, which states, in relevant part:

(1) The proceedings to obtain a reversal, vacation, or modification of judgments and decrees rendered or final orders made by the district court . . . shall be by filing in the office of the clerk of the district court in which such judgment, decree, or final order was rendered, within thirty days after the entry of such judgment, decree, or final order, a notice of intention to prosecute such appeal . . . .

. . . .

(3) The *running of the time for filing a notice of appeal shall be terminated as to all parties* . . . (b) *by a timely motion to alter or amend a judgment* under section 25-1329 . . . and the full time for appeal fixed in subsection (1) of this section commences to run from the entry of the order ruling upon the motion . . . . When any motion terminating the time for filing a notice of appeal is timely filed by any party, a notice of appeal filed before the court announces its decision upon the terminating motion shall have no effect, whether filed before or after the timely filing of the terminating motion. A new notice

of appeal shall be filed within the prescribed time after
the entry of the order ruling on the motion.

(Emphasis supplied.) See, also, § 43-2,106.01(1) (any final
order or judgment entered by juvenile court may be appealed to
Court of Appeals in same manner as appeal from district court
to Court of Appeals).

Because Daniel filed a timely motion to alter or amend, the
running of the time for filing a notice of appeal terminated,
and a notice of appeal was required to be filed after the entry
of the order ruling on the motion. See § 25-1912(b). However,
Daniel withdrew his motion to alter or amend, and on April
22, 2025, the court entered an order of withdrawal, ordering
that "the Amended Motion to Alter or Amend Judgment is
hereby withdrawn and no further hearing will be held on this
matter." Thus, the juvenile court's order acknowledged the
withdrawal and disposed of the motion. Alicia then filed a
notice of appeal in case No. A-25-388 within 30 days of the
April 22 order.

We agree with the parties that (1) the notice of appeal filed
in case No. A-25-177 was timely filed following the entry
of the initial February 11, 2025, juvenile court order, which
declined to terminate Daniel's parental rights, and (2) that the
notice of appeal filed in case No. A-25-338 was timely filed
following the entry of the April 22 juvenile court order that
disposed of the tolling motion. However, until a timely filed
tolling motion is disposed of by the entry of a court order, the
appeal clock is not triggered. See § 25-1912(3). Therefore,
the appeal filed in case No. A-25-177 is of "no effect," *id.*,
and is dismissed, while the appeal filed in case No. A-25-338
properly triggers the jurisdiction of this court.

### (b) Appeals From District Court

In case Nos. A-25-176 and A-25-337, Alicia's notices of
appeal identified the district court in the caption and were file
stamped in that court. We asked the parties to address whether
Daniel's pending counterclaim in the district court rendered any

appeal from the district court premature. Alicia claims that the pendency of Daniel's custody claims did not render these two appeals premature because "the proceeding before the juvenile court was special and its order affected the parties['] substantial, parental right." Brief for appellant at 14. "Moreover, in the context of multifaceted special proceedings . . . an order that ends a discreet phase of the proceedings affects a substantial right because it finally resolves the issues raised in that phase." *Id.* Daniel also points out that "Alicia is not appealing an order of the district court, and Daniel's pending counterclaim in the district court therefore has no effect on Alicia's appeal from the juvenile court." Brief for appellee at 11.

Alicia is challenging only the juvenile court's February 11, 2025, order. We acknowledge the likelihood that these two additional appeals were filed in the district court because, as will be discussed later, the juvenile court's order "transferred back" the case to the district court "upon entry of this order on today's date." This language may explain why Alicia took the cautionary step of filing notices of appeal in both the district court and the juvenile court.

However, any attempt to appeal from the district court at this time would not be properly before us because not all issues before that court have been resolved, including Daniel's counterclaim. See Neb. Rev. Stat. § 25-1315 (Cum. Supp. 2024) (any order that adjudicates fewer than all claims and rights and liabilities of all parties shall not terminate action as to any claims or parties; order remains subject to revision at any time before entry of judgment adjudicating all claims and rights and liabilities of all parties, and is therefore not final, appealable order). Thus, the two appeals from the district court are premature and are dismissed for lack of jurisdiction.

## 2. TERMINATION OF PARENTAL RIGHTS

We now address the merits of Alicia's appeal from the juvenile court's February 11, 2025, order. She contends that the juvenile court erred by dismissing her petition to terminate

Daniel's parental rights after finding that termination was not in the children's best interests. She also claims that the court failed to consider and find a statutory basis for terminating Daniel's parental rights.

### (a) Evidence From Hearing

The parties were married in 2013, had their children in 2015, and separated in January 2020. The parties were divorced on January 4, 2022, and Daniel has been incarcerated in Iowa since January 26 of that same year.

Alicia testified that there were "[a]t least ten" incidents of domestic violence during her marriage to Daniel. In 2015, she obtained a protection order against him while she was pregnant with their children because he "head-butted [her] right in the face" when "[h]e was drunk"; she later dismissed her protection order because they "were seeking . . . reconciliation." Regarding the 2015 incident, Daniel testified, "To this day, . . . I don't recall doing it," but he acknowledged that it was possible he did it while intoxicated. Alicia said she also obtained a protection order against Daniel in October 2019 after an incident when "[Daniel] was drunk, he was following me around the house and scaring me," so "I locked myself in the bathroom and called the police." The police detained Daniel while Alicia and the children left the home. Alicia later dismissed that protection order as well, because "[w]e agreed that we were working on reconciliation and that he would attend AA meetings." When asked if Daniel ever physically harmed the children, Alicia replied, "Not except for spanking too hard"; she also recalled an incident when Daniel "picked [their son] up in anger, was going to remove him from the table . . . the motion of picking him up really abruptly, he hit his head on the house" (she did not specify dates). (Alicia's adult daughter from a previous marriage testified that prior to January 2020, she saw Daniel discipline the parties' children: "often it would start with a — pretty aggressive speech and turn into spanking very quickly.")

Alicia stated that the parties separated in January 2020 after an incident when Daniel "was drunk, picked a fight," took her phone and credit card, and then "grabbed [her] and tried to forcibly remove [her] wedding ring from [her] hand" while the children were present. She said their son "actually hit [Daniel] trying to make him stop," and "I fought back" and "scratched" Daniel. She then took off her ring and "tossed it into the next room." Alicia called the police, but she was arrested because Daniel "lied and said that I had attacked him, and he had more markings on his body." During his testimony about the January incident, Daniel said that "[w]e had an argument[,] and she attacked me," and that "she called the cops and went to jail." Alicia testified that she was charged with domestic abuse, but the charges were subsequently dismissed. Daniel denied being charged with a criminal action related to this incident.

Both parties testified that after they separated in January 2020, Daniel had parenting time Wednesdays and every other weekend. Starting in August or September, his parenting time was required to be supervised. (Alicia said she had requested Daniel's parenting time be supervised because he had health issues at the time, and she had heard that he was using cocaine.) According to Alicia, Daniel exercised his supervised parenting time "[l]ess than five[]" times. The parties agreed that his last in-person parenting time with the children was in January 2021. A criminal no-contact order was entered on January 25, preventing Daniel from having any contact with Alicia or the children. He had no further contact with his children, in person or otherwise, prior to the January 4, 2022, divorce decree, which set forth a plan for phased-in parenting time. Daniel's only other contact with the children was one "FaceTime" call in January 2022, shortly after the divorce decree was entered. Daniel testified, "[T]he next day I got a call from my probation officer telling me not to contact them anymore" because it violated the criminal no-contact order. Daniel had no further contact of any kind with the children.

Daniel testified that, prior to 2020, he used alcohol, but not cocaine. However, after the entry of the January 2020 temporary order in the divorce proceeding, he began using cocaine "every other weekend the weeks I wouldn't have [the children]."

Justine Teut, formerly known as Justine Peebles (Justine), testified that she and Daniel had a "very short-lived" relationship that was "romantic in nature," beginning the last couple days in August or the first couple days of September 2020. She saw cocaine and guns in Daniel's home, and he had cocaine in the home on days he had parenting time with his children. Justine stated that in September, Daniel told her that "he wanted to get full custody of his kids and that he had orchestrated different things to try to harm [Alicia] to make these things come to fruition." Daniel "asked me to call the police and tell them . . . to, like, pull [Alicia] over on-site at the kids' school, telling them she had guns and drugs in the car, because he wanted to get her specifically pulled over on school grounds, for, like, child endangerment." Daniel "talked to me about it . . . on several occasions." Additionally, Daniel told her that "he had hired a hitman to kill Alicia, and he said . . . he would be on camera somewhere and so he had an alibi." Justine said she called Alicia to make sure that she was safe and to let her know what Daniel had been saying. Justine also called the police. (She made "iPhone" recordings of conversations with Daniel in September and October and sent the videos to law enforcement; the videos were received in evidence at the termination hearing.) Justine last saw Daniel in January or February 2021, when she encountered him while she was out with friends. She said that Daniel assaulted her because "he already knew that I had gone to the police about Alicia, and he was trying to . . . get me to change my story."

Daniel stated that in January 2021, he was charged with "[d]rugs, guns, stalking, and two counts of child endangerment." His drug charge "was a felony because of the quantity" of cocaine, "5.64 grams." He had "hired someone" to

plant cocaine in Alicia's car, with the intent that she would be arrested. When asked why he hired someone to plant cocaine in Alicia's vehicle, Daniel responded, "Because I thought it would gain me an upper hand in our custody battle." The person he hired to plant the drugs also "planted a gun" in Alicia's car; Daniel denied paying them to plant the gun but confirmed that he was responsible for the fact that it happened. (Alicia testified that she found the gun and drugs in her vehicle in a seat pouch "right in front of where [their son] always sat.") Daniel said that the stalking conviction was because he had "put a tracker" on Alicia's car, "not to know where she is, but to know where [the children] were." As part of the criminal case for stalking and child endangerment, a no-contact order was entered against Daniel on January 25, 2021.

According to an order entered by an Iowa district court on November 5, 2021, Daniel pled guilty to "Delivery of Cocaine, Aiding and Abetting"; the "pronouncement of sentence [was] deferred" and Daniel was placed on 5 years' probation. According to a separate order entered on November 5, Daniel pled guilty to "Stalking, an Aggravated Misdemeanor," and two counts of child endangerment. He was "committed to the custody of the Director of the Department of Corrections for a period of not more than 2 years" on each count; the sentences were to run consecutively "for a total term of incarceration of six (6) years." The order states that his sentences were "suspended" and that Daniel was "placed on probation" for 2 years. Additionally, his no-contact order was "continued for a period of five (5) years, until November 5, 2026." Daniel's deferred judgment and probation were ultimately revoked on May 11, 2022.

Daniel pled guilty to trespass causing bodily injury, assault causing bodily injury, and tampering with a witness (the victim was Justine); he said, "It was part of a plea agreement because I was drunk and high and didn't recall what I was doing." According to an order entered by an Iowa district court on November 23, 2021, Daniel was sentenced to consecutive

prison sentences of 1 year each for the trespass and assault convictions, and 2 years for tampering with a witness. The sentences in this case were also to run consecutively to the separate criminal case (i.e., delivery of cocaine, stalking, and child endangerment). The sentences were suspended, and Daniel was placed on probation for 2 years. Daniel's probation was ultimately revoked on May 11, 2022.

When Daniel's deferred judgment and probation terms were revoked on May 11, 2022, he was sentenced to 10 years' imprisonment for the "Delivery of Cocaine, Aiding and Abetting" conviction and to 2 years' imprisonment each for the stalking conviction and for the two child endangerment convictions; all counts were to run consecutively to each other, for a total of 16 years' imprisonment. He was also sentenced to 1 year's imprisonment for each trespass and assault conviction and 2 years' imprisonment for the tampering with a witness conviction; all counts were to run consecutively to each other, for a total of 4 years' imprisonment. Additionally, the sentences in the two cases were to run consecutively to each other, "for a total term of incarceration not to exceed twenty (20) years [in] prison."

Additionally, according to exhibits received into evidence, on January 26, 2022, Daniel was operating a vehicle while under the influence of an alcoholic beverage or other drug. Daniel testified that he was convicted of "OWI" (cocaine and "meth") and that "they gave me 126 days in jail, time served." Prior to the "OWI," he used meth "three, four times." The June 2022 sentencing order received into evidence shows that Daniel pled guilty to "OWI" and was sentenced to 126 days' incarceration, with the time already served.

Daniel testified that he has been sober since he was incarcerated on January 26, 2022, and that "I'm a completely different person sober." "[T]here's some drugs at every prison, but . . . I just don't even have a desire," "I had [a] bad year and a half, and now that I'm clear-headed and everything like that, I look at it — everything way different."

According to an "EFR Residential Substance Use Assessment Summary Report," Daniel was "assessed for substance abuse services" on April 22, 2022. Daniel was diagnosed with "Cocaine Type Use Disorder, Mild," and "[d]ue to [Daniel's] self-reported cocaine use, it is recommended that he participate in Level 1.0 Extended Outpatient treatment." Daniel testified that he did not get the opportunity to attend the recommended outpatient treatment because he "went to prison" and that treatment was not available to him at his correctional facilities. "The only thing they had at the . . . Jail was . . . every Monday they would have guys from [Alcoholics Anonymous] come in and talk to us," "[s]o I participated in that." When Daniel was later in a different correctional facility, he "attend[ed] [Narcotics Anonymous] every Friday," and he completed a 24-session treatment program called "Achieving Change Through Value-Based Behavior" (ACTV) for domestic violence offenders. He was on a waiting list to participate in a parenting class at his current correctional facility.

According to Daniel, he was denied parole two times. Daniel did not expect to be released the first time, because "I had not completed treatment[,] and I hadn't been in prison long enough . . . for parole to grant it to me." He did believe that he would be paroled the second time, because "I had [ACTV] treatment completed[,] and my counselor recommended my parole"; "they would not tell me why I didn't receive parole." Daniel said that he would be eligible for parole again in May 2025. He confirmed that eligibility for parole did not mean that he would be paroled.

Alicia testified that she never told the children that Daniel was incarcerated. When asked what she told the children about why they have no contact with Daniel, Alicia responded, "The day that he was arrested [in January 2021] and the protective order was put in place, I — I said to them, he's not going to be calling you anymore," "he's made some bad choices and he's getting some help, but we probably won't — he won't be

calling for a while." The children "were happy with that and never asked a single question since."

Alicia believes that termination of Daniel's parental rights is in the children's best interests. At the time of trial, the children were 9½ years old, and Alicia testified that they do not have a relationship with Daniel. Their daughter has "never asked" about Daniel since he was arrested in 2021, and their son "probably every two to three months" will make a reference to Daniel, "usually involving golf." (The children's nanny since 2021 testified that she has never heard the children refer to Daniel. And Alicia's current husband testified that the children have lived with him since "around the new year of" 2022 and have never asked about Daniel; the daughter has never referred to Daniel, and the son "very occasionally, will bring up [sic] usually if golf is involved.") When asked if she ever mentioned Daniel to the children since January 2022, Alicia replied, "I have not brought him up, no," but "[i]f they brought him up . . . I always reply in a positive manner." When asked if she has concerns for her safety or the safety of the children if Daniel is released on parole, Alicia replied, "Yes." She said, "He's made many threats . . . that he would like to kill me," and "I would put nothing past him as far as the children, if he felt rejected by them, I would put nothing past him."

According to Daniel's testimony, he did not currently have a relationship with his children and he was not currently providing financial support for them. He had previously paid off his child support obligations after selling the marital home in 2023 (the remainder of the sale money was used to pay back money to his parents that he had previously borrowed to pay off the mortgage and "get it out of [Alicia's] name" as part of the divorce). (Alicia testified that Daniel satisfied other court-ordered obligations to her from that house sale, including outstanding childcare expenses and attorney fees.) By the time of the termination hearing in October 2024, Daniel was "like 13,000" in arrearages in child support and his current court-ordered child support obligation was $75 per month.

Daniel said, "I don't have a job at this [correctional] facility" and "[i]t's a long wait list for a job"; "[l]ast I knew I was number 19 on the list." When asked if he had sent any cards or gifts to his children in the past year, Daniel responded, "I'm not allowed to send them anything," "[b]ecause there was a protection order in place."

Daniel acknowledged that he did not make any attempts to modify the criminal no-contact order prior to being notified of the filing of the petition for stepparent adoption of the parties' children in October 2023. He said he did not realize he could petition to modify the criminal no-contact order until "about a year ago" when his current attorney "pointed it out"; he then "instructed" his attorney "to get it modified." Exhibits received into evidence show that in February 2024, counsel filed a motion in the Iowa district court in Daniel's criminal case to modify the no-contact order; that court subsequently modified the no-contact order "to reflect that it is not an NCO [violation] for [Daniel] to exercise whatever visitation rights have been granted to [him] concerning [the children in] any existing or pending family law case, whether in Iowa or Nebraska." Daniel then instructed his attorney to ask Alicia's attorney to allow phone calls with the children, but he was not allowed any phone calls. He then filed a motion in the Sarpy County District Court to allow phone calls (i.e., his motion for temporary orders and motion to compel parenting time); that motion was still pending at the time of the termination hearing.

When asked, if given the opportunity, how he planned to address the long period of absence from his children's lives, Daniel responded, "I'll just tell them the truth, that I've made a lot of bad decisions and I didn't mean to harm them. And just, I'm sure it will take time . . . for them to forgive me. I — I mean, I'm going to try to do whatever I can." Daniel believed it was in his children's best interests to resume contact with him because "I'm their biological dad." (Having children of his own was important to Daniel. He said, "[T]hat

was the only reason why I got married.") While incarcerated, Daniel wrote in journals for each of the children; "that way, eventually when I get out, I can give those to [them] so that way they know I never forgot about them." Daniel had been able to get updates about his children from his mother and sister. Alicia had allowed Daniel's mother and sister to have contact with the children for a time when Daniel was incarcerated. During her testimony, Alicia confirmed that she continued to facilitate the children's relationship with Daniel's family after he was incarcerated in January 2022, but she asked Daniel's mother to stop contacting her in January 2024 because Daniel's mother helped him hire an attorney.

The court-appointed guardian ad litem for the children in the separate stepparent adoption case testified that she met with the children in May 2024, when they were 9 years old. At that time, while looking at photographs on the wall of Alicia's home, the children identified Alicia's husband as "their dad" and "referred to the adoption as making [him] officially their father." The children were aware that Daniel was their biological father. When the guardian ad litem asked them what they remembered about Daniel, "they said they hadn't seen him since they were four"; Daniel's daughter "didn't remember" him, and his son "remember[ed] [Daniel] had a beard" and took him golfing and hunting. The guardian ad litem said, "[T]he children have not had any contact with [Daniel] since . . . they were four." She further said, "And they're now nine years old, and so my concern would be is what impact it would have on their well-being and mental health to introduce a parental figure that they don't know as a parental figure."

Regarding any future contact Daniel might have with the children, Alicia's current husband testified, "I'm concerned that their mental health, they — they have not seen him in so long, I think him being reintroduced back into their lives would definitely affect [the daughter], and I think it would affect [the son's] well-being as well."

Christopher Pierce testified that he had known Daniel for approximately 10 years. Sometime in 2020, Pierce stopped having in-person contact with Daniel because Pierce felt that Daniel "was in a bad place [and] was abusing some substance"; Daniel "[j]ust seemed . . . somewhat erratic," "[k]ind of a party mentality." After Daniel was incarcerated, Pierce went through the process to be able to maintain email communication with him because "I know [Daniel] to be a good person, and he was a good friend, and . . . I felt like he needed that support in prison." Pierce testified that Daniel's conversations are now "logical." He further explained, "[D]rugs isn't [sic] a part of that conversation anymore, . . . and he's made some reference that he was in a bad place and that is behind him now," and "he seems genuine about that." During their conversations, Daniel "regularly" mentioned his children, "and he wants nothing more than to be a part of . . . his kids' lives."

### (b) Applicable Law and Analysis

[11,12] Under the Nebraska Juvenile Code, terminating parental rights requires both clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and clear and convincing evidence that termination is in the best interests of the children. *Benjamin S. v. Crystal S.*, 313 Neb. 799, 986 N.W.2d 492 (2023). See, also, § 43-292. Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. *Benjamin S. v. Crystal S., supra.* Proving that termination would be in the best interests of the child is a high hurdle because a parent's right to raise his or her children is constitutionally protected. *Id.* Therefore, we apply a rebuttable presumption that it is in the child's best interests to maintain a relationship with his or her parent. *Id.* The presumption can be overcome by proof of parental unfitness. See *id.*

[13] Termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. *Kitsmiller v. Kitsmiller*, 31 Neb.

App. 473, 983 N.W.2d 147 (2022). With such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort. *Id.*

Alicia argues that "[t]he juvenile court erred [in] failing to consider and find a statutory basis for terminating [Daniel's] parental rights." Brief for appellant at 34. Although the juvenile court did not conduct an explicit analysis of every alleged statutory ground for termination, it was not necessary for it to do so in light of its finding that termination was not in the children's best interests. See, *Benjamin S. v. Crystal S., supra* (termination of parental rights requires clear and convincing evidence of statutory ground *and* that termination is in children's best interests); *Kitsmiller v. Kitsmiller, supra* (although juvenile court did not conduct explicit analysis of statutory grounds for termination, such was unnecessary in light of court's finding that termination was not in child's best interests).

The juvenile court indicated that it would "address some of the underlying allegations relating to the provisions of [§] 43-292 while considering the best interests of the children," but that its focus was on the "best interests of the children and the necessity to terminate the parental rights of [Daniel] given the unique facts to this case and the alternative to termination." It acknowledged Alicia's argument that consideration of the statutory factors leaned in favor of terminating Daniel's parental rights, and it stated, "This court might agree. However, this court requires more than leaning in favor of when taking the drastic and final step of termination." Thus, while the juvenile court did not analyze each alleged statutory factor under § 43-292, it appeared to agree that a statutory basis existed for terminating Daniel's parental rights. However, it went on to conclude that Alicia "failed to meet her burden to show termination of [Daniel's] parental rights [was] in the best interests of the children." Therefore, even accepting that Alicia proved one or more statutory grounds for termination by clear and convincing evidence, we nevertheless agree

with the juvenile court that terminating Daniel's parental rights is not necessary, nor in the children's best interests at this time. Alternative measures remain available in the district court, as indicated by the juvenile court. See *Kitsmiller v. Kitsmiller, supra* (parental rights should be terminated only in absence of any reasonable alternative and as last resort).

The juvenile court stated that the district court could create a "safety plan and issue orders limiting or excluding contact" and that Daniel could "be required to demonstrate sobriety prior to any contact." It also referred to Daniel's testimony that "he wishes to have a relationship with his children," and it concluded that the evidence did not support that he had abandoned the children. The court pointed out that there were "numerous competing orders suggesting that [Daniel] could not legally contact the children after he was incarcerated" and that he "communicated with family members" to obtain information about the children. The court pointed to Daniel's testimony that he hoped to be released "sometime in the summer of 2025" and that "his case manager supports his release." The court also noted that Alicia had facilitated a relationship with Daniel's "side of the family until she learned they assisted him in acquiring an attorney to fight the adoption proceedings." It acknowledged Daniel's testimony that he was not the "same person" and that he was "no longer addicted to drugs and alcohol. It also acknowledged that "[w]hether [Daniel] will be fit to parent or even have contact with the children when he is released from custody remains to be seen." The court pointed out that this was not a case involving physical or sexual assault of a child and that if the evidence "included aggravated circumstances such as these, the court's analysis and conclusion might be different." It also stated that Alicia's "purpose for termination," being "in part to allow her new husband to adopt the children," was not factored in its consideration, and the court added that her husband "seems like a wonderful stepparent" and that the "children are lucky to have him in their lives."

Our assessment of the evidence is consistent with that of the juvenile court. Although Daniel's own actions led to the criminal no-contact order and his incarceration, Daniel testified that he has been sober since January 2022 and is now "a completely different person." As pointed out by Daniel, his addiction and criminal behaviors occurred prior to the entry of the Iowa divorce decree and were discussed therein, but the court nevertheless provided him parenting time. Notably, there is nothing in our record to suggest that Alicia appealed or otherwise challenged the Iowa court's order that provided Daniel a phased-in parenting schedule, which included video or telephone calls and was to progress to in-person supervised visits. However, due to his incarceration and the no-contact orders, he was unable to exercise the parenting time he was granted. While incarcerated, Daniel wrote in journals for each of the children to give to them when he was eventually released, "so that way they know I never forgot about them." Also, Daniel made efforts to modify the no-contact order and have contact with his children once he realized he could do so after obtaining his current attorney.

Alicia's current husband and the guardian ad litem appointed in the separate stepparent adoption proceeding did express some concern that reintroducing Daniel to the children could affect the children's mental health and well-being. But like the juvenile court, we find that those concerns can be addressed outside of a termination of Daniel's parental rights. The circumstances present here can be distinguished from those cases brought by the State seeking to terminate an individual's parental rights. Unlike those cases, the children involved in this case are not being left in foster care to languish in a temporary setting for an unknown amount of time; rather, they have the security and stability of being cared for by their mother and stepfather while further steps are taken to determine whether Daniel can appropriately and safely maintain a parenting relationship with his children.

Further, in cases initiated by the State, parents are usually provided with services and a reasonable period of time to attempt to overcome their personal deficiencies or incapacities that led to the State's involvement. In this case, at the time of the Iowa divorce decree in January 2022, there was certainly evidence to support the imposition of a phased-in supervised parenting schedule, given Daniel's drug and alcohol abuse and reprehensible behaviors in the preceding years. However, since that time, there was evidence that Daniel has been sober since his incarceration in January 2022, that he has no desire for drugs, and that "he wants nothing more" than to be a part of his children's lives. And while there is evidence to support that Daniel may have overcome his past deficiencies or incapacities, we agree with the juvenile court's cautionary assessment that "[w]hether [Daniel] will be fit to parent or even have contact with the children when he is released from custody remains to be seen" and that "[t]he district [c]ourt can tailor a safety plan and issue orders limiting or excluding contact with [Daniel] should he be released."

Alicia argues that "the heart of [her] petition was to determine whether Daniel should be excluded from [the] children's lives before ever reaching that point" and that "[c]omplicating the issue by avoidance and putting it off to a later date is not in the best interests of the children." Brief for appellant at 49. However, based on our de novo review, we agree with the juvenile court that Alicia failed to meet her burden to prove that terminating Daniel's parental rights was in the children's best interests. With such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort. *Kitsmiller v. Kitsmiller*, 31 Neb. App. 473, 983 N.W.2d 147 (2022).

In this case, there remains a reasonable alternative to maintaining Daniel's parental rights. Daniel's contact with the children can be addressed in the modification proceeding before the district court. See *Benjamin S. v. Crystal S.*, 313 Neb. 799, 816, 986 N.W.2d 492, 503 (2023) (Supreme Court concluded

there was not clear and convincing evidence that terminating mother's parental rights was in children's best interests and reversed district court's termination order; Supreme Court "express[ed] no view regarding the parties' respective requests to modify the decree or how the district court might structure a modified parenting plan within the context of modification proceedings"). Accordingly, we affirm the order of the juvenile court dismissing Alicia's petition for termination of Daniel's parental rights.

### 3. Transfer Back to District Court

Alicia claims the juvenile court erred in transferring the case back to the district court without any notice, hearing, or input from the parties. She argues, "The parties should have been notified of the [juvenile] court's decision regarding termination and have been allowed to appeal that decision in the juvenile court, or move to alter or amend the same, as well as seek temporary or other orders before jurisdiction was transferred." Brief for appellant at 51. However, as discussed previously, the juvenile court's order indicating it was transferring the case back to the district court did not preclude it from maintaining jurisdiction for a timely filed motion to alter or amend and the subsequent filing of a notice of appeal. Further, there is nothing to suggest that Alicia attempted to file any post-decision motions in the juvenile court, and she was able to appeal the juvenile court's final order once the court disposed of the tolling motion. Any further matters related to the best interests of the children can be addressed in the district court.

### VI. CONCLUSION

For the foregoing reasons, in case No. A-25-338, we affirm the juvenile court's February 11, 2025, order dismissing Alicia's petition to terminate Daniel's parental rights. The other three appeals are dismissed.

APPEALS IN NOS. A-25-176, A-25-177,
AND A-25-337 DISMISSED.
JUDGMENT IN NO. A-25-338 AFFIRMED.